LAWRENCE LEE GHIDONI, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; LAWRENCE L. GHIDONI and JOYCELYN B. GHIDONI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ghidoni v. Commissioner
Docket Nos. 29063-84, 11986-85
United States Tax Court
T.C. Memo 1991-284; 1991 Tax Ct. Memo LEXIS 332; 61 T.C.M. (CCH) 2993; T.C.M. (RIA) 91284; June 25, 1991, Filed *332 Decisions will be entered under Rule 155. Lawrence L. Ghidoni, pro se. Willie Fortenberry, for the respondent. PARKER, Judge. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Year
Deficiency Addition to Tax Sec. 6653(b)
1974
$ 5,164.80
$ 2,582.40
1975
1,941.00
970.50
1976
193,292.40
96,646.20
1977
949,451.51
474,725.76
1980
6,543.00
--
Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues for decision are: 1) Whether petitioners received constructive dividends from petitioner-husband's wholly owned corporation, American Industries International, Inc., that they failed to report on their 1976 and 1977 tax returns; 2) Whether petitioners received interest income that they failed to report on their 1976 and 1977 tax returns; 3) Whether petitioners received consulting fee income that they failed to report on their 1977 tax return; 4) Whether petitioners received a distributive *333 share of trust income from the Lawrence L. Ghidoni Trust that they failed to report on their 1977 tax return; 5) Whether petitioner-husband's bad debt from the 1976 payment of a loan as guarantor was a business or nonbusiness bad debt; 6) Whether petitioners' standard deduction should be increased by $ 700 in 1976; 7) Whether the $ 24,584 petitioners deducted as Schedule C expenses in 1977 were ordinary and necessary business expenses and were in fact paid in 1977; 8) Whether petitioners are entitled to investment tax credits in 1977; 9) Whether petitioners sustained a net operating loss in 1976 and were entitled to carry back and to deduct such net operating loss in prior years, and whether petitioners were entitled to use income averaging for 1975 as a result of any changes resulting from these carrybacks; 10) Whether petitioners are entitled to additional general tax credits for their 1975 taxable year; 11) Whether petitioners are liable for the addition to tax for fraud in years 1974 through 1977, inclusive; 12) Whether respondent timely mailed petitioner-husband a notice of deficiency for 1980; 13) Whether petitioner-husband failed to report his proper share of trust *334 income from the Lawrence L. Ghidoni Trust in 1980, which depends primarily upon the adjustment for depreciation and disallowance of certain deductions; 14) Whether petitioner-husband is entitled to deduct in 1980 charitable contribution passthroughs from that trust; 15) Whether petitioner-husband is entitled to deduct in 1980 interest expense passthroughs from that trust; and 16) Whether petitioner-husband is entitled in 1980 to an investment tax credit passthrough from that trust. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of facts and the exhibits attached thereto are incorporated herein by this reference. The Ghidonis
Petitioners Lawrence L. Ghidoni (Ghidoni) and Joycelyn B. Ghidoni (Mrs. Ghidoni) resided in Tallahassee, Florida at the time they filed their petitions. During the years at issue the Ghidonis were husband and wife and were calendar year, cash method taxpayers. Mrs. Ghidoni attended Southern Illinois University and Florida State University. She studied art, archaeology, English, and history but did not obtain a degree from either university. She has held mostly secretarial positions since leaving college. *335 Ghidoni received most of his college education at Southern Illinois University where he studied design and general science. After leaving Southern Illinois University, Ghidoni got a job designing plastics, then went to TRW as a contract negotiator and later began working for Univac in Dallas. He was granted a leave of absence from Univac to complete his degree in international affairs at Florida State University. Ghidoni attended graduate school at Florida State University, studying international law and international finance.
American Industries International, Inc. -- A Brief History
While still attending Florida State University, Ghidoni began an export trading company, Lawrence International Industries, Inc. (LII, Inc.), [1] and started dealing in PVC pipe, valves, fittings, and chemical process pumps. Ghidoni then designed a folding house which he sold to Central American, Caribbean, and Middle Eastern buyers. Both the PVC pipe and housing businesses were growing, but Ghidoni did not understand the necessity of cash flow planning, and LII, Inc. went bankrupt in 1973. *336 After LII, Inc.'s bankruptcy, Ghidoni incorporated Lawrence International Industries, Ltd., Inc. (sometimes referred to as LILI) and held all of its stock. Ghidoni subsequently changed LILI's name to American International Industries, Inc. (AII, Inc.), so that customers and suppliers would not connect this business with the corporation that had previously gone bankrupt. LILI (and subsequently AII, Inc.) resumed LII, Inc.'s PVC products business where LII, Inc. had left off. AII, Inc. also sold railroad crossties to several different railroads and sold lumber to the Egyptian Government and other customers. In October of 1974, AII, Inc.'s business was limited to railroad crosstie sales with some minor PVC orders; however, at that time AII, Inc. was seeking to expand its building materials and lumber business worldwide. AII, Inc. -- Key Personnel
AII, Inc. had three officers during the years in issue, Ghidoni (President), Mrs. Ghidoni (Secretary/Office Manager), and John Bender (Director of Finance and Contract Administration) and from three to nine employees. Mrs. Ghidoni was the corporate secretary and a director of the corporation; however, Ghidoni was the sole shareholder *337 as well as a corporate director and the president. Ghidoni controlled AII, Inc. and made all of the major business decisions for the company. Mrs. Ghidoni functioned as AII, Inc.'s office manager: she opened AII, Inc.'s incoming mail and saw that it was properly distributed; she handled the filing system for company records; she hired secretarial staff; and she was involved in the preparation and signing of checks for various company expenditures, especially when Ghidoni was out of town. Mrs. Ghidoni was generally at AII, Inc.'s offices from 9:00 a.m. to 5:00 p.m. on a daily basis. Bender, who was not a corporate director, was responsible for assisting in the preparation of "pro formas" (offers or quotations) that AII, Inc. would issue to supply various products around the world. When these offers were accepted and orders came in, Bender was responsible for working with the product suppliers, shipping lines, and shipping agencies AII, Inc. used to ship its products to customers. He also worked with the port authorities through which the products were shipped and with other parties who provided services handling the shipments. Bender was most deeply involved, however, in processing *338 the letters of credit (discussed below) that AII, Inc.'s various customers around the world used to remit their payments to AII, Inc. Another AII, Inc. employee, Paul Earnhart (Ghidoni's nephew), spent a great deal of his time in Egypt developing customers among various agencies of the Egyptian Government. AII, Inc. -- Operations
As noted above, purchasers of most goods sold by AII, Inc. used letters of credit to pay for the shipments, naming AII, Inc. as the beneficiary of the letter of credit. AII, Inc. received 90 to 95 percent of its payments via letters of credit. The letters of credit were collectible by the international departments of large banks in the United States of America, including Chemical Bank, Philadelphia National Bank, Security Pacific International Bank, Bank of America, and Citizens and Southern National Bank of Atlanta. The letters of credit were sometimes issued through the Banque De Cairo and were thereafter transferred to one of the aforementioned American banks. At Ghidoni's direction, Bender would write letters advising the banks how to distribute the funds among AII, Inc.'s suppliers, shippers, and corporate bank accounts. The Celanese Corporation, *339 World of Plastics, and Carlon Company supplied AII, Inc.'s PVC products needs. AII, Inc.'s major railroad crosstie and lumber suppliers were the Continental Can Company (Continental Can) and Meridian Wood Company, although a large number of smaller sawmills located throughout the Southeastern United States also supplied AII, Inc. with lumber and railroad crossties. However, viewed in dollar terms, crosstie orders were only a small portion of the total business AII, Inc. did, particularly in 1976 and 1977. Under AII, Inc.'s supply contracts with Continental Can, Continental Can retained title to any goods shipped to AII, Inc.'s customers until the issuance of an onboard bill of lading. At the time the shipper issued the onboard bill of lading, title passed to AII, Inc. At virtually that same moment, however, title passed from AII, Inc. to its customer pursuant to the contract of sale between AII, Inc. and its customer. Thus, AII, Inc. held title to the goods only briefly. However, AII, Inc. always took title to the goods and did not act as an agent or broker in these sales transactions. [2]
*340 AII, Inc.'s principal contact with Continental Can was the national sales manager for Continental Can's forest products division, William Boswell (Boswell). AII, Inc. made special size and quantity requests that Continental Can either could not or would not fill from its own mills. Boswell located mills outside of the Continental Can group that would supply AII, Inc. with products exceeding Continental Can's capacity or willingness to supply. In addition, Boswell supplied Ghidoni with insider information concerning the operation of the Continental Can sawmills, and this information gave AII, Inc. an advantage in negotiations with Continental Can. AII, Inc. paid Boswell for his services. [3]
Ghidoni persuaded Boswell to have Continental Can ship crossties without first receiving any money or security from AII, Inc. Continental Can shipped the crossties on open account as they were produced. Letters of credit *341 were arranged for some of AII, Inc.'s crosstie sales, but most crosstie customers paid for shipments on a collection basis, with the Citizens and Southern Bank in Atlanta (C&S) acting as AII, Inc.'s collection agent. Pursuant to a "distribution of funds" form AII, Inc. would send to C&S, C&S would first distribute any money owed to suppliers and shippers and then deposit the remainder in AII, Inc.'s corporate bank account. Comparing transactions conducted on a collection basis and those conducted with a letter of credit at that time, there was no substantial difference in the manner in which the recipient banks distributed the funds. The banks, in either situation, received the total payment from AII, Inc.'s customer, paid AII, Inc.'s supplier and shipper, and then remitted the balance to AII, Inc. Ghidoni Meets Hassanien
In July of 1974, AII, Inc. received a tender offer seeking bids to supply crossties to the Egyptian National Railway. The tender offer was to be acted on in January of 1975. AII, Inc. prepared a "pro forma," and Ghidoni traveled to Cairo in January of 1975 to try to obtain the Egyptian National Railway order and possibly other orders. There Ghidoni *342 met Medhat Hassanien (Hassanien), an Egyptian attorney, who represented the Egyptian cotton industry and other clients. Ghidoni retained Hassanien to assist AII, Inc. in acquiring orders from various governmental agencies in Egypt. Hassanien would notify AII, Inc. of prospective orders; and, once AII, Inc. had obtained the orders, Hassanien would assist the corporation in getting the various agencies to open letters of credit to it. Hassanien was married to Soad Ghaba, who was a partner in a certain business. Ghaba's business, Egyptian American Industries, also assisted AII, Inc. in the acquisition and disposition of orders from various Egyptian governmental agencies. AII, Inc. compensated Hassanien and Egyptian American Industries with a commission based on a percentage of AII, Inc.'s gross sales. That percentage varied from two to ten percent. Clarendon, Inc. and Subaccount No. 1359
A year after Ghidoni and Hassanien met, it looked as though the Egyptian Government would be placing substantial orders for Western products. In January of 1976, Ghidoni traveled with Boswell of Continental Can to the Cayman Islands. Ghidoni either purchased a "shelf corporation" (a shell *343 corporation already incorporated) or incorporated Clarendon, Ltd. (Clarendon), a corporation incorporated in the Cayman Islands. The Ghidonis owned all of Clarendon's stock as joint tenants with rights of survivorship. Immediately after acquiring Clarendon, the Ghidonis transferred their Clarendon stock to three nominees: Galt, Ltd. which held one share; Bute, Ltd. which also held one share; and the Bank of Nova Scotia Trust Company (Cayman), Ltd. (hereinafter BNSTC (Cayman)), which held the remaining 98 shares. These nominees held the Clarendon stock for the Ghidonis' benefit. On this same trip in January of 1976, Boswell opened a bank account in his own name at the BNSTC (Cayman). Clarendon did not have any employees, assets, liabilities, capital, income, or expenses. Clarendon never had any employees and never engaged in any business activities, except opening a bank account. Clarendon opened a bank account, subaccount No. 1359, at the BNSTC (Cayman). [4] *345 At that time an abrupt change in the distribution of AII, Inc.'s sales proceeds took place. The banks receiving payments for goods sold by AII, Inc. distributed funds to various suppliers and creditors of AII, Inc., to *344 AII, Inc.'s corporate bank accounts, and to the Clarendon account at the BNSTC (Cayman). All of the funds deposited into the Clarendon account were part of the customers' payments to AII, Inc., either in the form of collections for crosstie sales or in the form of letters of credit in favor of AII, Inc. In other words, a portion of AII, Inc.'s gross receipts were deposited into the Clarendon account. Interest was earned on the funds deposited in the Clarendon account. Ghidoni exercised exclusive control over the funds in this account. [5] In 1976, a total of $ 381,243.96 was deposited into the Clarendon account and in 1977 a total of $ 1,354,314.16. The Alleged Ghidoni-Hassanien Agreement
In late 1975 or early 1976, Hassanien and Ghidoni allegedly sat down with Ghidoni's attorney, Taylor Moore, and prepared a document entitled "AGREEMENT." [6] *347 The term of this purported agreement extended from October 1, 1974, before Ghidoni had even met Hassanien, until October 1, 1977. The purported agreement established an agency relationship between Ghidoni on behalf of AII, Inc. and Hassanien on behalf of Middle East Development Trading Group (Trading). See supra, note 2. Under the purported agreement Ghidoni's duties were to act as Trading's exclusive agent for its purchases and sales of any goods having their origin in North America and destination in various Middle Eastern countries. The purported agreement essentially required Trading to pay Ghidoni a commission of one percent of the gross cost of any sale *346 and to reimburse Ghidoni for all of his direct and indirect expenses arising from the agency relationship not to exceed eight percent of the gross cost of any sale. The purported agreement both acknowledged that Ghidoni would from time to time take title to and bear the risks of ownership of goods purchased by Trading and indemnified and held Ghidoni harmless for most losses he might have sustained acting in his agency capacity. The purported agreement further provided that Trading would advance Ghidoni funds against his final expenses, and that these advances would be considered loans until Ghidoni actually earned them. The purported agreement required Trading to provide funds to collateralize any required bid bonds or performance bonds. The record does not establish that this purported agreement was ever executed, or if ever executed, that it was executed during the period 1974 through 1977. See supra, note 6. In any event, neither Ghidoni nor AII, Inc. ever followed any of the terms of this purported agreement. [7]
Ghidoni Seeks Professional Tax Advice
In February of 1976, Ghidoni contacted William H. Gardner, a certified public accountant in Tallahassee, Florida. At that time Ghidoni had not yet filed personal income tax returns for *348 1973 and 1974 and also faced Internal Revenue Service (IRS) collection activity involving a 100-percent penalty for payroll taxes for one of the Lawrence corporations. Moreover, AII, Inc. had not filed any corporate tax returns. Ghidoni wanted Gardner's advice about these matters and also wanted Gardner to handle the future accounting needs of both AII, Inc. and the Ghidonis. In seeking Gardner's advice Ghidoni discussed Clarendon's function. Ghidoni told Gardner that he used Clarendon to generate fictitious sales commissions owing from AII, Inc., so that he could funnel money away from AII, Inc. to the Cayman Islands. Thus, when a United States bank paid over funds it received on a letter of credit from a foreign bank, the payment to AII, Inc. would be made net of any amounts owed to suppliers, shippers, and any amounts transferred as "sales commissions' to Clarendon. Ghidoni's ultimate objective was to return the money to himself in the United States in some nontaxable form, as a purported loan, for example. On November 17, 1976, Ghidoni and Moore met with Gardner to discuss formalizing an agreement between AII, Inc. and Clarendon. Ghidoni intended this phony agreement to *349 provide substantiation for or to lend an air of legitimacy to the arrangement between AII, Inc. and Clarendon in case the IRS were to audit AII, Inc.'s books. Ghidoni asked Gardner to view AII, Inc.'s books and records through the eyes of an IRS agent and to try to determine what types of documents the agent would be likely to request in an examination of either AII, Inc. or Clarendon. Gardner obtained portions of the IRS Manual dealing with examinations of controlled foreign corporations, and he and Ghidoni discussed the IRS's ability to summons third-party records from banks. At some point during their business relationship Ghidoni told Gardner that he could generate invoices with an Italian typewriter to document Clarendon's "commissions." Ghidoni also collected typewriter ribbons and other office supplies of varying ages in order to have the capability to create "old" (i.e., backdated) documents. Gardner advised Ghidoni that AII, Inc.'s payments to Clarendon were not deductible, because they were not ordinary and necessary business expenses, and were paper shams. Gardner also advised Ghidoni that due to his common ownership of the stock of Clarendon and AII, Inc., the IRS *350 would be able to reallocate income from one entity to another pursuant to section 482. Gardner further advised Ghidoni that he risked liability for payment of tax on a dividend under section 956 each time money was "loaned" back into the United States. Gardner told Ghidoni that Clarendon was a controlled foreign corporation and that Ghidoni could potentially face fraud additions for not disclosing Clarendon's existence or status to the IRS. Gardner's firm was attempting to set up a system of computerized books for AII, Inc. AII, Inc. provided Gardner's firm with source documents to work from, and Gardner's firm would process the source documents and return working copies of computerized books and records to AII, Inc. Ghidoni was not satisfied with the work AII, Inc. received and wanted Gardner's firm to reprogram its computer system to generate books and records that would reflect information in a manner Ghidoni thought would be more desirable. Gardner and his staff were willing to accommodate Ghidoni's requests up to a point; however, in Gardner's view the requests became unreasonable. Gardner terminated his business relationship with Ghidoni and AII, Inc. in the latter part *351 of 1977, because in his opinion Ghidoni had become too difficult to deal with. Gardner never prepared tax returns for the Ghidonis or for AII, Inc., because he thought that Ghidoni was not providing him with accurate information. Ghidoni told Gardner that he did not want "to pay any damn taxes." [8]
AII, Inc.'s Books and Records
Ghidoni was not as concerned about maintaining accurate and timely records of AII, Inc.'s business transactions as he was about getting and shipping orders and having funds available to provide for his and his family's financial security. Because he assumed that he could always update the books later, Ghidoni placed a higher priority on filling orders. Also Ghidoni wanted the books and records to be set up showing AII, Inc.'s net receipts as gross receipts or showing the funds transferred to Clarendon *352 as "commissions," something that he had been told was improper. [9] AII, Inc. did not perform a monthly accounting, a quarterly accounting, or even an annual accounting of its business transactions. AII, Inc. did not keep accurate books and records from which proper tax returns could have been prepared. Fund Transfers from the Clarendon Account
From the Clarendon account *353 at the BNSTC (Cayman) funds flowed to several destinations at Ghidoni's direction. In 1976 the Ghidonis built a 5,500 square-foot home in northeast Tallahassee. The house cost approximately $ 92,000, and Ghidoni paid cash for it without borrowing any funds. The land -- seven acres on a lake -- cost approximately $ 30,000, and Ghidoni again paid cash. Ghidoni transferred out of the Clarendon account at the BNSTC (Cayman) the funds used to pay for the house and land, a total of $ 122,000. In earlier years Ghidoni had become personally liable as a guarantor for a $ 30,000 loan the Industrial National Bank had made to LII, Inc. prior to its bankruptcy. Ghidoni was sued by the Industrial National Bank and was required to pay on his guaranty. In 1976, Ghidoni transferred $ 50,000 out of the Clarendon account and used $ 30,000 of those funds to satisfy his guarantee liability. The Ghidonis used the remaining $ 20,000 for other personal purposes. On February 25, 1976, Ghidoni transferred $ 50,000 from the Clarendon account to an account at the Flagship Bank of Tampa. At some point in time Ghidoni purportedly executed a $ 50,000 promissory note in favor of Hassanien (as lawyer for *354 Trading), dated February 27, 1976. The record does not establish whether that note was ever executed, or if so, when. The purported loan to Ghidoni was a sham. The record does not show what happened to the $ 50,000. On March 23, 1976, Ghidoni transferred $ 21,082.37 from the Clarendon account to Boswell's account at the BNSTC (Cayman). That payment was compensation for services Boswell had rendered to AII, Inc. See supra, note 3. At some point in time Ghidoni purportedly executed a $ 50,000 promissory note in favor of Hassanien (as lawyer for Trading), dated April 1, 1976. The record does not establish whether that note was ever executed, or if so, when. That purported loan to Ghidoni was also a sham. On April 6, 1976, Ghidoni requested the BNSTC (Cayman) to transfer $ 100,000 from the Clarendon account to an account at the Flagship Bank of Tampa. On April 12, 1976, Ghidoni requested the Flagship Bank to place the $ 100,000 in either a savings account or a certificate of deposit in the Ghidonis' names. On May 4, 1976, Ghidoni requested the Flagship Bank to deposit the $ 100,000 into AII, Inc.'s corporate account upon maturity of the certificate of deposit. The record *355 does not establish whether that was done or what happened to those funds. At some point in time Ghidoni purportedly executed a $ 100,000 promissory note in favor of Hassanien (as lawyer for Trading), dated May 12, 1976. The record does not establish whether that note was ever executed, or if so, when. The purported loan to Ghidoni was a sham. On June 16, 1976, the BNSTC (Cayman) transferred $ 49,975 from the Clarendon account to Ghidoni's personal account at the Barnett Bank of Jacksonville. On June 23, 1976, the Barnett Bank drew three cashier's checks payable to Ghidoni in the total amount of $ 49,970. Ghidoni transferred $ 40,000 of these funds to Moore who deposited them into his law firm's client trust account. The record does not establish what Ghidoni did with the remaining $ 9,970. On September 16, 1976, the BNSTC (Cayman) transferred $ 125,000 from the Clarendon account to Ghidoni's account at the Flagship Bank of Tampa. Ghidoni placed these funds in a certificate of deposit payable to Ghidoni on October 18, 1976, at a rate of 5.125 percent. Flagship provided AII, Inc. with the bid bonds and performance bonds AII, Inc. had to post in order to bid for public contracts. *356 This certificate of deposit served as collateral for a bond required of AII, Inc. However, the record does not indicate that the funds were ever paid over to AII, Inc. On that same date Ghidoni transferred $ 2,346.91 from the Clarendon account to Boswell's account at the BNSTC (Cayman). The payment was compensation for services Boswell had rendered to AII, Inc. At some point in time Ghidoni purportedly executed a $ 125,000 promissory note in favor of Hassanien (as lawyer for Trading), dated November 1, 1976. The record does not establish whether that promissory note was ever executed, or, if so, when. The record is devoid of any evidence tying this note to any particular transfer of funds from the Clarendon account; in any event, this purported loan to Ghidoni was also a sham. All of the promissory notes from Ghidoni to Hassanien discussed above were prepared after the fact and backdated. These promissory notes were prepared after the tax audit and investigation began. There were no bona fide loans from Hassanien to Ghidoni. American Industries Leasing, Inc.
In May of 1977, Ghidoni formed American Industries Leasing, Inc. (AIL, Inc.). The record does not establish *357 that this corporation engaged in any business activities in 1977. Preparation and Filing of Tax Returns
By late October of 1977, Arthur Andersen & Company had completed preparation of the Ghidonis' individual tax returns for 1974 through 1976 and AII, Inc.'s corporate returns for 1974 through 1976. The accounting firm and the Ghidonis were aware that Ghidoni had received several notices from the IRS asking about the unfiled returns and that it was "only a question of time until they [the IRS] appear at the door." The Ghidonis signed their returns and Ghidoni signed the corporate returns on November 4, 1977, and mailed them to the IRS. Attached to each of the returns was the same explanation for the late filing of the returns. That explanation discussed Ghidoni's travels and the many bookkeepers the corporation had hired at different times, but did not mention Gardner or his efforts to set up books and records for AII, Inc. The portion of AII, Inc.'s gross receipts that had been transferred to the Clarendon bank account in the Cayman Islands was not reported on either the corporate tax returns or on the Ghidonis' individual tax returns. On the individual returns, the Ghidonis *358 answered "No" to the question as to whether they had "any interest in or signature authority over a bank, securities, or other financial account in a foreign country * * *." The record does not indicate that Arthur Andersen & Company had any knowledge about the funds transferred to the Cayman Islands account or about the existence of Clarendon and subaccount No. 1359. See supra, note 9. Arthur Andersen & Company had been told that Ghidoni anticipated "the receipt of a large amount of taxable income personally from overseas" and wanted to get the matter of his late tax returns behind him before he started collecting that income. Multinational Securities, Ltd.
On November 10, 1977, shortly after filing the above returns, the Ghidonis formed Multinational Securities, Ltd. (MSL), a Cayman Islands corporation. The same nominees who held the stock of Clarendon held MSL's stock for the Ghidonis' benefit in the same proportions. All of Clarendon's assets were transferred to MSL. [10] At Ghidoni's request, Clarendon was stricken from the register of active Cayman Islands corporations. Thereafter, MSL was operated in the same manner as was Clarendon. The BNSTC (Cayman) agreed *359 to provide its staff to act as directors and officers of MSL and charged a management fee for doing so. By the time Ghidoni incorporated MSL he *360 had already received several IRS inquiries concerning unfiled tax returns, and he was concerned that the Service might find out that he was holding funds in Clarendon outside the United States. He intentionally lied on his tax returns about the foreign bank account.
The Ghidoni Trust and the Oak Hills Apartments
Also sometime in 1977, Ghidoni formed a grantor trust, the Lawrence L. Ghidoni Trust (the Ghidoni Trust), listing Homer J. Mottice as the trustee. On December 12, 1977, the Ghidoni Trust purchased Oak Hills Apartments, an apartment complex, located in Tallahassee, Florida. The purchase price was $ 1,280,000, including costs, and the contract required the Ghidoni Trust to pay $ 352,012 at closing. Mottice had contracted to purchase the apartment complex for $ 1,200,000 from the Union Commerce Bank in Cleveland, Ohio, and sold his contract to Ghidoni for $ 65,000. The contract required Ghidoni to pay an additional $ 15,000 to the Union Commerce Bank's apartment manager. The Union Commerce Bank financed the difference between the amount Ghidoni paid down at the closing (plus a $ 65,000 second mortgage and a $ 15,000 binder) and the total purchase price. The flow *361 of funds necessary to complete this transaction involved the transfer of $ 349,985 from the Clarendon account to Moore's client trust account at the Florida State Bank of Tallahassee and finally to the seller. At some point in time Ghidoni purportedly executed a $ 350,000 promissory note in favor of Hassanien (as lawyer for Trading), dated December 12, 1977. The record does not establish whether this note was ever executed, or, if so, when. The purported loan to Ghidoni and this note were phony. Amendment to AIL, Inc.'s Articles of Incorporation
By the end of 1977, AII, Inc. had ceased conducting business. In fact, by the time Bender left the company at the end of September 1977, business operations had virtually halted, and Ghidoni was no longer seeking orders from customers. Ghidoni filed AII, Inc.'s 1977 corporate tax return in February of 1978 and attached a statement to the return notifying the IRS that: The Corporation would be dissolved if its existence were not required as a plaintiff in a law suit. The corporation has been inactive prior to December 31, 1977, and will remain inactive until the resolution of the aforestated legal matter, at which time it will *362 be dissolved.
That litigation involved a company called FITTCO. In any event, neither AII, Inc.'s 1977 return nor the Ghidonis' individual return for 1977 reported the portion of AII, Inc.'s gross receipts that had been transferred to the Clarendon bank account in the Cayman Islands. Again the Ghidonis answered "No" to the question as to whether they had any interest in or signature or other authority over a bank, securities, or other financial account in a foreign country. On March 30, 1978, Ghidoni amended AIL, Inc.'s articles of incorporation to permit the corporation to issue 375,000 one-cent par value shares of class A voting stock and 375,000 one-cent par value shares of class B nonvoting stock. After the amendment Hassanien at some point in October 1978 allegedly received 278,000 of the 375,000 shares of class B nonvoting stock outstanding, while Ghidoni's 7,500 shares of class A voting stock were converted into 350,000 shares of class A one-cent par value voting stock. The minutes of the special meeting of the shareholders in March 1978 recited that Ghidoni stated that Hassanien would invest an initial $ 750,000 in the corporation. The record does not establish *363 when those minutes were prepared, but most of the events involving AIL, Inc. and Hassanien occurred after the tax audit of the Ghidonis began on July 12, 1978. American Industries International, Ltd.
On March 31, 1978, Ghidoni and AIL, Inc. formed a limited partnership, American Industries International, Ltd. (AII, Ltd.). [11] Ghidoni was the general partner with a 95-percent interest in partnership profits, and AIL, Inc. was a limited partner with the remaining 5-percent profits interest. Neither partner paid the $ 500 initial contribution the limited partnership agreement required. At that time the Ghidoni Trust transferred ownership of the Oak Hills Apartment complex to AII, Ltd. *364 On April 10, 1978, Ghidoni transferred approximately $ 750,000 from the Clarendon account to an account with Merrill Lynch that had been opened in AII, Ltd.'s name. Ghidoni made several large transfers out of the Merrill Lynch account to pay costs relating to AII, Ltd.'s ownership and operation of the Oak Hills Apartments. The Ghidonis' Audit
On July 12, 1978, Revenue Agent Joanne Harmon wrote to petitioners about the audit of their 1977 return. She was initially assigned to examine the Ghidonis' 1977 Federal income tax return, but the examination was later extended to cover the Ghidonis' 1976 return, a net operating loss-based refund claim the Ghidonis had filed for 1974 and 1975, and AII, Inc.'s corporate income tax returns for 1976 and 1977. On July 12, 1978, Agent Harmon wrote to the Ghidonis to inform them that she would be field auditing their 1977 tax return. At her first conference with the Ghidonis on August 10, 1978, Agent Harmon asked Ghidoni whether he had borrowed any money. Ghidoni told Agent Harmon that he had borrowed $ 125,000 from Hassanien to collateralize a bid bond. Ghidoni stated that after the bid bond had been released, Hassanien permitted him *365 to use $ 100,000 of the funds to start a leasing venture, and that he still owed Hassanien $ 25,000. Agent Harmon asked for written documentation of the transaction, and Ghidoni stated that there was none. At another conference with Ghidoni on February 8, 1979, Agent Harmon asked whether Ghidoni owned stock, either personally or through AII, Inc., in any foreign corporation. Ghidoni's response was "No." Agent Harmon asked Ghidoni whether he, either personally or through AII, Inc., had signature authority over, or an interest in, any bank accounts, securities, or financial accounts in a foreign country. Again, Ghidoni responded "No." At this conference Ghidoni gave Agent Harmon notes indicating that he owed Hassanien a certain amount of money. Ghidoni could not recall when or where he had received the money or signed the notes. Ghidoni also presented Agent Harmon with a note that he claimed was a consolidation of all the other notes, but he did not know whether he had signed this note on the date indicated. At a conference on June 8, 1979, Ghidoni was asked about Clarendon, and he told IRS personnel that Clarendon was Hassanien's corporation. On July 25, 1979, Ghidoni telephoned *366 the BNSTC (Cayman) to request the bank to stop sending correspondence directly to him until further notice. Ghidoni informed the bank that if there was anything requiring his immediate attention, it should be sent to the BNSTC (Nassau) to await his collection there. On August 6 and 7, 1979, the IRS sent to Clarendon duplicate third-party record keeper notices of a summons concerning the Ghidonis' tax liability for the 1975 through 1978 taxable years. The duplicate notices covered all records maintained by Clarendon. The BNSTC (Cayman) immediately forwarded copies of the notices to Ghidoni. At a conference on September 2, 1980, Ghidoni told Agent Harmon that Hassanien "pulled government listings for him" in Egypt. He denied that he paid Hassanien for these services, but indicated that payment for such services was probably included in the legal fees Hassanien billed him for. Ghidoni Attempts to Subpoena-proof the BNSTC (Cayman) Bank Records
On October 18, 1982, Ghidoni and a lawyer representing him met with BNSTC (Cayman) executives at the bank's offices in the Cayman Islands. The purpose of the meeting was to discuss a change in nominal ownership of Clarendon by making *367 Clarendon's nominee shareholders answerable to Hassanien as beneficial owner, rather than directly to petitioners. The Ghidonis were under investigation by the IRS at this time and were concerned that they might be forced to disclose documents related to the Clarendon account at the BNSTC (Cayman). Ghidoni had been advised that the interposition of Hassanien as a second level nominee shareholder of Clarendon would render ineffective any waiver of the Cayman Islands Confidential Relationships (Preservation) Law coming directly from the Ghidonis. The bank was concerned that it might be charged as being party to a conspiracy to avoid legal obligations in the United States and refused to accept the assignment to Hassanien. The bank also pointed out that the Ghidonis were the "relevant principals" of that account. Criminal Proceedings in the District Court
On October 5, 1983, in United States of America v. Lawrence L. Ghidoni, Criminal No. TCR-83-07016 (N.D. Florida), the United States filed a 4-count indictment against Ghidoni, charging that he had wilfully and knowingly made and subscribed Forms 1120, U.S. Corporate Income Tax Returns, as president of AII, Inc., for taxable *368 years 1976 (count one) and 1977 (count three), which he did not believe to be true and correct as to every material matter, and for wilfully and knowingly making and subscribing Forms 1040, U.S. Individual Income Tax Returns, for taxable years 1976 (count two) and 1977 (count four) which he did not believe to be true and correct as to every material matter, all in violation of section 7206(1). On December 3, 1984, Ghidoni entered into a plea agreement, agreeing to plead guilty to count 4 of the October 5, 1983 indictment. Specifically, he agreed to plead and later in fact pled guilty to the charge that he wilfully and knowingly filed a 1977 tax return that he did not believe to be true and correct as to every material matter in that "he reported total income of $ 51,623; whereas, as he then and there well knew and believed, his total income was substantially in excess of the amount heretofore stated." On December 30, 1983, the district court ordered Ghidoni to execute a waiver directing the BNSTC (Cayman) to provide records as requested by the United States pursuant to its earlier subpoena. Ghidoni formally entered his guilty plea on January 16, 1985, and on the same date the district *369 court imposed a 3-year suspended sentence on the condition that Ghidoni serve 90 days' incarceration and three years of probation and pay a $ 5,000 fine. The Ghidonis' Tax Returns
As indicated above, the Ghidonis signed and filed their 1974, 1975, and 1976 joint income tax returns in November of 1977. They signed and filed their 1977 return in February of 1978 and filed their 1980 return in June of 1981. On their 1976 return, the Ghidonis reported a loss of $ 26,214 and a $ 2,100 standard deduction. The $ 26,214 reported loss stemmed from their $ 30,000 guarantee payment on the defaulted loan from Industrial National Bank to the original LII, Inc. They reported this payment as an ordinary loss incurred in a transaction entered into for profit. The Ghidonis filed an application for tentative refund and carried the purported $ 28,314 1976 loss back to 1973 and 1974. The carrybacks resulted in modifications in the 1973 and 1974 base period years for purposes of income averaging in 1975. They recalculated their 1975 income averaging and requested refunds for 1974 and 1975. For 1977, the Ghidonis reported taxable income of $ 48,623 on their Form 1040. To arrive at this *370 figure, they deducted $ 24,584 in Schedule C business expenses and a $ 77,204 trust loss. The Ghidonis derived the figure for the trust loss from the Form 1041, U.S. Fiduciary Income Tax Return, filed on behalf of the Ghidoni Trust for its 1977 taxable year. The Ghidoni Trust Form 1041 reported the following income and expense components involved in the trust loss: Income:
Gross Rents
$ 9,229
Miscellaneous Income
239
Gross Income
$ 9,468 Expenses:
Repairs and Maintenance
552
Utilities
12
Insurance
486
Taxes
719
Interest Expense
8,650
Trustee Fees
451
Depreciation
75,802
$ 86,672 (See Schedule A)
Net Income (Loss)
$ (77,204)
On the Schedules B for both their 1976 and 1977 returns, the Ghidonis indicated that they had no interest in or signatory authority over any foreign bank accounts. Ghidoni believed that if he divulged his control over a foreign bank account, the IRS would automatically audit him; so, he lied. The Ghidonis reported a loss of $ 3,791 on their 1980 return. Contributing to their reported 1980 loss was a $ 30,152 trust loss. The Ghidonis derived the figure for the trust loss from a partnership loss appearing *371 on a Schedule K-1 for AII, Ltd. which was attached to the Form 1041, U.S. Fiduciary Income Tax Return, filed on behalf of the Ghidoni Trust for its 1980 taxable year. Respondent's Notices of Deficiency
As a result of the order in the criminal proceedings, Agent Harmon ultimately obtained four volumes of the BNSTC (Cayman) bank records pertaining to the Clarendon account. To compute the Ghidonis' unreported income for 1976 and 1977, Agent Harmon added all of the sales proceeds (gross receipts) transferred from AII, Inc. to Clarendon together with a few personal expenses that AII, Inc. had paid for Ghidoni. Agent Harmon adjusted this figure by amounts the Ghidonis had previously reported as income and by a $ 100 dividend exclusion. Agent Harmon also calculated AII, Inc.'s earnings and profits for 1976 and 1977: $ 441,951.43 and $ 1,342,379.95, respectively. On May 15, 1984, respondent mailed the Ghidonis a notice of deficiency covering their 1980 taxable year. Respondent disallowed the Ghidonis' reported trust loss and, instead, determined that the Ghidonis had received $ 9,490 in trust income. On March 21, 1985, respondent mailed the Ghidonis a notice of deficiency covering *372 their taxable years 1974, 1975, 1976, and 1977. For 1976, respondent determined that the Ghidonis had received unreported income from several sources. First, respondent increased the Ghidonis' 1976 income in the amount of $ 382,023.96 to reflect alleged constructive dividends received from AII, Inc., principally through Clarendon ($ 381,243.96) and to a minor extent directly ($ 780). Next, respondent increased the Ghidonis' 1976 income by an additional $ 809.12 in interest income. Respondent recharacterized the Ghidonis' $ 30,000 loss as a nonbusiness bad debt and subjected it to the capital loss limitations, arriving at an allowable deduction of $ 1,000 for 1976. Respondent increased the Ghidonis' 1976 standard deduction to $ 2,800. The above-described adjustments to the Ghidonis' 1976 taxable income resulted in a deficiency determination of $ 193,292.40 for 1976, wiped out the net operating loss petitioners had reported and carried back to 1973 and 1974, and reversed the modifications in the Ghidonis' 1973 and 1974 base periods for purposes of 1975 income averaging. Accordingly, respondent determined deficiencies of $ 5,164.80 and $ 1,941, respectively, in the Ghidonis' taxes *373 for the 1974 and 1975 taxable years. For 1977, respondent again determined that the Ghidonis had received unreported income from several sources. Respondent initially increased the Ghidonis' 1977 income in the amount of $ 1,357,045.95 to reflect alleged constructive dividends received from AII, Inc., principally through Clarendon ($ 1,354,314.16) and to a minor extent directly ($ 2,731.77). This was then reduced to reflect the $ 100,000 reported by the Ghidonis and the $ 100 dividend exclusion for a net amount of $ 1,256,945.95. Next, respondent increased the Ghidonis' 1977 income by additional trust income of $ 6,087 and additional consulting fees of $ 17,000. Lastly, respondent increased the Ghidonis' 1977 income by $ 750 in interest income. In addition, respondent disallowed the Ghidonis' $ 77,204 trust loss deduction and $ 24,584 business expense deduction. Lastly, respondent determined fraud additions for the Ghidonis' taxable years 1974 through 1977, inclusive. ULTIMATE FINDINGS OF FACT 1. Petitioner Lawrence L. Ghidoni received $ 358,494.68 (net) and $ 1,256,945.95 (net) in constructive dividends from AII, Inc. in 1976 and 1977, respectively. 2. Petitioners underpaid *374 their Federal income tax in 1974, 1975, 1976, and 1977. 3. The underpayment of tax each year was due to fraud within the meaning of section 6653(b) on the part of petitioner Lawrence L. Ghidoni. OPINION This fraud case involves the normal split burden of proof. Petitioners must prove any error in the deficiency determinations by a preponderance of the evidence, and respondent must prove fraud each year by clear and convincing evidence. Sec. 7454(a); Rule 142(a) and (b); Henson v. Commissioner, 887 F.2d 1520, 1525 (11th Cir. 1989), affg. a Memorandum Opinion of this Court; Zack v. Commissioner, 692 F.2d 28, 29 (6th Cir. 1982), affg. a Memorandum Opinion of this Court; Webb v. Commissioner, 394 F.2d 366, 372-377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; [12]Petzoldt v. Commissioner, 92 T.C. 661, 697-699 (1989). *375 Issue 1: Constructive Dividends in 1976 and 1977
As pertinent here, subsections (a) and (c) of section 301 include cash dividend distributions in a shareholder's gross income. Generally speaking, section 316(a) defines the term "dividend" as a corporate distribution of property to its shareholders (in their capacity as such) out of earnings and profits. The absence of a formal dividend declaration will not foreclose us from recharacterizing a given distribution as a dividend-in-fact, and attempts to disguise a dividend in some other form will be unavailing. Truesdell v. Commissioner, 89 T.C. 1280, 1295 (1987). Also, Loftin and Woodard, Inc. v. United States, 577 F.2d 1206, 1214 (5th Cir. 1978); Crosby v. United States, 496 F.2d 1384, 1388 (5th Cir. 1974). As this Court has stated: Where a corporation confers an economic benefit on a shareholder without the expectation of repayment, that benefit becomes a constructive dividend, taxable to the shareholder, even though neither the corporation nor the shareholder intended a dividend. However, "not every corporate expenditure which incidentally confers economic *376 benefit on a shareholder is a constructive dividend." The crucial test of the existence of a constructive dividend is whether "the distribution was primarily for the benefit of the shareholder." Loftin & Woodard, Inc. v. United States, supra, at 1214; Crosby v. United States, 496 F.2d 1384, 1388 (5th Cir. 1974); Sammons v. Commissioner, 472 F.2d 449 (5th Cir. 1972), affg., revg., and remanding a Memorandum Opinion of this Court.
Magnon v. Commissioner, 73 T.C. 980, 993-994 (1980). Whether or not a given distribution is a dividend in disguise is a question of fact. Loftin and Woodard, Inc. v. United States, 577 F.2d at 1215. At this point it would be helpful to identify what is not in dispute. Petitioners do not dispute the amounts of funds respondent determined to have been transferred into the Clarendon bank account in 1976 and 1977; thus, we deem them to have conceded this point. Rothstein v. Commissioner, 90 T.C. 488, 497 (1988). Three subissues remain for our decision: (1) did the funds transferred to the Clarendon account in the Cayman Islands *377 belong to AII, Inc.; (2) did AII, Inc. have sufficient earnings and profits to pay dividends in the amounts of these transferred funds; and (3) did the funds transferred to Clarendon and controlled by Ghidoni primarily benefit the Ghidonis. Regarding the first subissue -- whether the funds transferred to the Clarendon bank account belonged to AII, Inc. -- petitioners point to the purported agency agreement between Ghidoni/AII, Inc. and Hassanien/Trading and argue that the funds belonged to Hassanien/Trading. Petitioners contend that Hassanien agreed to lend Ghidoni the funds transferred to Clarendon and that Ghidoni intended to repay Hassanien. Petitioners' theory is that the funds in the Clarendon bank account never belonged to AII, Inc., and that AII, Inc. could not distribute a dividend with these funds. Respondent essentially argues that the purported agency agreement between Ghidoni/AII, Inc. and Hassanien/Trading was a complete sham intended only to lend an aura of commercial legitimacy to Ghidoni's diversion and personal use of AII, Inc.'s funds. Respondent further contends that the papers purporting to document loans (alleged promissory notes) between Hassanien/Trading *378 and Ghidoni were also shams. In respondent's eyes the facts establish that AII, Inc. conducted its sales on its own behalf and not as an agent or broker for Trading. We agree with respondent's view of the evidence and have so found. Our assessment of Ghidoni's credibility is critical to our resolution of the first subissue. Ghidoni lied to the Federal Government when filling out the portion of his 1976 and 1977 tax returns that requested information concerning control over or interest in foreign bank accounts. He lied again about his control over or interest in the Clarendon account when questioned on audit. Similarly, he lied about his ownership interest in Clarendon when questioned on audit. In his discussions with Gardner, Ghidoni showed a propensity to fabricate false documents. We are satisfied that many of the proffered documents, such as the purported promissory notes, were phony documents fabricated by Ghidoni after the fact. Our assessment of Ghidoni as a witness is that he will say whatever he thinks will be helpful to his case and will not hesitate to lie. In short, we do not find him to be a credible witness. Ghidoni argues that Hassanien was a prominent and *379 well-connected Egyptian attorney whose clients ranged from sheiks to heads of state to some of the largest consortiums in the world; that during his January 1975 trip to Egypt he and Hassanien entered into an oral agreement for Hassanien and Hassanien's wife, Soad Ghaba, to provide any services they could to help AII, Inc. get the Egyptian National Railway order; and that in return, Ghidoni would act as a purchasing agent for Hassanien's clients in the United States and Canada. Ghidoni argues further that the written agreement he and Hassanien signed after AII, Inc. received the Egyptian National Railway order embodied their earlier oral agreement; that the agreement required Trading to supply the funds AII, Inc. needed to operate as Trading's agent; that the Egyptian National Railway order never came to fruition for AII, Inc., but that, in its capacity as agent for Trading, AII, Inc. filled other orders from the Egyptian Government; and that the money in the Clarendon account legally belonged to Trading, but that due to the frustration of AII, Inc.'s objectives under the agreement, Hassanien and Trading had agreed to give Ghidoni complete control over (but not ownership of) Trading's *380 funds. We did not believe Ghidoni's testimony. See supra, notes 2, 4, 6, and 7. On brief, Ghidoni further embellished his implausible story with ex parte materials not in the evidentiary record of the case. See supra, note 7. We have concluded that if the document purporting to be a written agency agreement between Ghidoni/AII, Inc. and Hassanien/Trading existed during the years in issue, it was merely a proposal that never went into effect. Based on Bender's testimony, which we found credible and accept, neither Ghidoni nor AII, Inc. ever abided by the terms of this purported agreement. We think that this document was nothing more than an inartful attempt by Ghidoni to paper over a bald scheme to evade taxation on diverted funds belonging solely to AII, Inc. Several additional factors support this conclusion. If AII, Inc. had received funds as an agent or broker for Trading, there would have been no need for Ghidoni to form Clarendon to divert the funds offshore and try to return them to the United States in some nontaxable form. Instead, AII, Inc. could simply have taken its compensation and passed the remaining funds along to Trading. The discussion between Ghidoni *381 and Gardner about formalizing a phony sales agency agreement between AII, Inc. and Clarendon so that AII, Inc. could deduct the transfers of funds to Clarendon as "sales commissions" would have been completely unnecessary. So, if we were to accept Ghidoni's version of the facts, when we put the puzzle together and look at the big picture we would have some critical pieces left over: Clarendon's whole existence would become meaningless. However, based on the testimony of Gardner, which we believed, the whole purpose of establishing Clarendon was to divert part of AII, Inc.'s funds offshore and later to return the money to Ghidoni in the United States without payment of taxes by Ghidoni. Secondly, the promissory notes purportedly showing loans from Hassanien/Trading to Ghidoni did not materialize until after Agent Harmon requested documentation and Ghidoni had already told her that none existed. We are satisfied that the purported promissory notes were fabricated by Ghidoni after Agent Harmon requested documentation. Thirdly, AII, Inc. compensated Hassanien and Soad Ghaba's company, Egyptian American Industries, with a percentage commission of AII, Inc.'s gross sales in Egypt. *382 It is incomprehensible why AII, Inc. would pay commissions to Hassanien and Egyptian American Industries, if AII, Inc. were acting as their agent or broker. Finally, we are persuaded by the manner in which AII, Inc.'s business transactions were actually carried out. Bender testified, and the Court believed him, that all Egyptian purchases, not just the Egyptian National Railway purchase, were made directly from AII, Inc., that Trading was never a principal, that Ghidoni stressed both within and without the company that AII, Inc. was neither an agent nor a broker, that AII, Inc. had an employee, Paul Earnhart, stationed in Egypt to deal face to face with the Egyptian agencies, and that AII, Inc., in fact, retained a much higher percentage of the proceeds of any given sale than was envisioned under the purported agency agreement with Hassanien/Trading. Also, Ghidoni's actions at the time of the events are far more persuasive to the Court than his later fabrications and embellishments. While Ghidoni did not tell Arthur Andersen & Company about Clarendon and the BNSTC (Cayman) bank account and on his tax returns lied about having any foreign bank account, [13] nonetheless Ghidoni disclosed *383 to Arthur Andersen that he expected to receive "a large amount of taxable income personally from overseas." See the Arthur Andersen memorandum to the file. At the time his returns were filed in 1977, Ghidoni knew that the money in the Cayman Islands bank account was his income and taxable to him. Only later did he concoct the story that the funds really belonged to some unnamed clients represented by Hassanien. We conclude and *384 have found as a fact that the entire amount of funds diverted to the Clarendon account at the BNSTC (Cayman) belonged to AII, Inc. Additionally, we note that the record contains no persuasive evidence of Ghidoni's intent to repay these funds to AII, Inc., to Hassanien, or to anyone else. Moreover, the story of Hassanien's putative ownership of Clarendon (or the funds) is something that first emerged rather sketchily during the tax audit and that reached its full flower in petitioners' post-trial briefs, documents that can only be described as Ghidoni's latest work of fiction. See supra, note 7. Regarding the second subissue -- whether AII, Inc. had sufficient earnings and profits to pay dividends in the amounts transferred to Clarendon -- petitioners state in conclusory fashion in their reply brief that "There is no proof to substantiate that American Industries International, Inc. had sufficient earnings and profits for dividend distribution for 1976 and 1977 in the amounts stated." Petitioners' argument can only hinge on their theory that the money transferred to Clarendon belonged to Hassanien/Trading. We have already concluded that the funds transferred to Clarendon belonged *385 to AII, Inc. Moreover, the diverted funds were net of AII, Inc.'s expenses and would have been available for distribution to Ghidoni either as compensation or as dividends. Petitioners presented no evidence tending to refute respondent's determination of earnings and profits, and given the overwhelming evidence that the transferred funds belonged to AII, Inc., we conclude that AII, Inc. had sufficient earnings and profits to support the payment of the dividends each year. Truesdell v. Commissioner, 89 T.C. at 1295-1296. Regarding the third subissue -- whether the funds transferred to Clarendon primarily benefited the Ghidonis -- petitioners have failed to meet their burden of proving the ultimate destination or use of most of the funds. To reiterate, the Ghidonis do not dispute respondent's calculation of the total amounts of AII, Inc.'s funds deposited into the Clarendon account during 1976 and 1977. There can be no controversy over the status of the $ 122,000 transferred out of the Clarendon account in 1976 to pay for the Ghidonis' new home. This distribution was clearly a constructive dividend. Since Ghidoni was personally liable as guarantor of the *386 insolvent LII, Inc.'s loan from the Industrial National Bank, the $ 30,000 transfer to the bank in 1976 to satisfy his personal liability was a constructive dividend to Ghidoni. Wortham Machinery Co. v. United States, 521 F.2d 160, 164 (10th Cir. 1975); Cox v. Commissioner, 56 T.C. 1270, 1280 (1971). The $ 30,000 paid to the bank was only part of that $ 50,000 transfer of funds from Clarendon. The remaining $ 20,000 was used by the Ghidonis for other personal purposes and was also a constructive dividend. Although the $ 50,000 Ghidoni transferred out of the Clarendon account on February 25, 1976, was the subject of the purported $ 50,000 promissory note dated February 27, 1976, that note was produced after Agent Harmon requested documentation and after Ghidoni had already told her that none existed. We think that Ghidoni fabricated that note after Agent Harmon requested documentation. There is no reliable evidence either that Hassanien/Trading loaned the funds to AII, Inc. or that the money was used to benefit AII, Inc. Accordingly, we conclude that this distribution too was a constructive dividend to Ghidoni. The $ 21,082.37 Ghidoni *387 transferred from the Clarendon account to Boswell's account at the BNSTC (Cayman) on March 23, 1976, directly benefited AII, Inc. and did not constitute a constructive dividend. Boswell was paid that amount for his services to AII, Inc. [14]
Ghidoni transferred $ 100,000 from the Clarendon account on April 6, 1976, and placed it in a CD in petitioners' names at the Flagship Bank of Tampa on April 12, 1976. While Ghidoni apparently told the bank to transfer the funds to AII, Inc.'s corporate account after the CD matured on May 12, 1976, the record does not show whether or not the funds ever reached AII, Inc. or remained under the control of Ghidoni. We thus conclude that this $ 100,000 distribution too was a constructive dividend to Ghidoni. The record contains little evidence as to the use to which Ghidoni put the $ 49,975 he transferred from the Clarendon account on June *388 16, 1976. We know that he transferred $ 40,000 to Moore's client trust account. We do not know the purpose behind the transfer, but Moore was Ghidoni's attorney. We also do not know the destination of the remaining $ 9,975 funds. Accordingly, since the money was under Ghidoni's control and there is no evidence that it was used for the benefit of AII, Inc., we conclude that the entire amount of this distribution -- $ 49,975 -- was a constructive dividend to Ghidoni. Ghidoni transferred $ 125,000 from the Clarendon account and placed it in a 30-day CD at the Flagship Bank of Tampa on September 16, 1976. The CD was used to collateralize AII, Inc.'s bid bonds and performance bonds. The record does not indicate to what use Ghidoni put the funds after the CD matured. There is no indication that AII, Inc. ever received the $ 125,000. Accordingly, petitioners have not met their burden of proof, and we conclude that the $ 125,000 was a constructive dividend to Ghidoni. Also on September 16, 1976, Ghidoni transferred $ 2,346.91 from the Clarendon account to Boswell's account at the BNSTC (Cayman). This payment was compensation for services Boswell had rendered to AII, Inc. See *389 supra, note 14. Accordingly, we conclude that the $ 2,346.91 should not be charged as a constructive dividend to Ghidoni. The $ 349,985 Ghidoni transferred from the Clarendon account to the Union Commerce Bank in 1977 to make the down payment on the Oak Hills Apartments provided no benefit to AII, Inc. This was an entirely separate personal investment by Ghidoni and/or his grantor trust. Accordingly, we have found that this portion of the diverted funds is a constructive dividend to Ghidoni. To sum up, respondent adjusted the Ghidonis' taxable income upward for total gross constructive dividends of $ 382,023.96 in 1976 and $ 1,357,045.95 in 1977. [15] We have redetermined the resulting deficiencies to take into account funds transferred to Clarendon but ultimately used to benefit AII, Inc. These funds consist of the $ 21,082.37 transferred to Boswell on March 23, 1976, and the $ 2,346.91 transferred to Boswell on September 16, 1976. We uphold the remainder of respondent's constructive dividend adjustments. *390 Issue 2: 1976 and 1977 Interest Income
Respondent determined that petitioners were in receipt of additional interest income of $ 809.12 in 1976 and $ 750 in 1977. We are unable to find any evidence in the record relevant to this issue. Petitioners have failed to meet their burden of proof. Rule 142(a). We sustain respondent's interest income adjustments. Issue 3: 1977 Consulting Fee Income
Respondent determined that petitioners received an additional $ 17,000 in consulting fee income in 1977 that they failed to report on their tax return. The record contains no evidence relevant to this issue. Petitioners have failed to meet their burden of proof. Rule 142(a). We sustain respondent's consulting fee adjustment. Issue 4: 1977 Trust Income
Our knowledge of this issue begins and ends with two observations: (1) that Ghidoni formed a grantor trust in 1977; and (2) that the Ghidonis reported a 1977 loss from the Ghidoni Trust of $ 77,204 which respondent redetermined as $ 6,087 in income. Petitioners have not directed our attention to any evidence in the record which would support their position. They have failed to meet their burden of proof, and respondent's *391 adjustment will stand. Rule 142(a). Issue 5: 1976 Bad Debt
Initially petitioners argued that the $ 30,000 loss on the payment as a guarantor of LII, Inc.'s loan was a loss in a transaction entered into for profit under section 165(c). The Supreme Court long ago held that a shareholder's payment as a guarantor of his corporation's loan is deductible, if at all, only as a bad debt under section 166. Putnam v. Commissioner, 352 U.S. 82, 1 L. Ed. 2d 144, 77 S. Ct. 175 (1956). Section 166(a) permits taxpayers to deduct debts which become partially or wholly worthless during the taxable year. Section 166(d) limits the deductibility of nonbusiness bad debts incurred by noncorporate taxpayers. Generally, for individual taxpayers, section 166(a) does not apply to nonbusiness bad debts, there is no deduction for a partially worthless bad debt, and the nonbusiness bad debt is deductible only as a short-term capital loss. Sec. 166(d); sec. 1.166-5(a)(2), Income Tax Regs. Section 166(d)(2) defines the term "nonbusiness bad debt" as a debt other than: (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from *392 the worthlessness of which is incurred in the taxpayer's trade or business.
In 1973 or earlier years Ghidoni had guaranteed a $ 30,000 loan to LII, Inc. After LII, Inc. went into bankruptcy, the lender, Industrial National Bank, brought suit against Ghidoni on his guaranty. In 1976, Ghidoni transferred $ 30,000 out of the Clarendon account to pay off his liability. The Ghidonis reported this payment as a loss on a transaction entered into for profit and deducted the entire amount as an ordinary loss on their 1976 return. Respondent recharacterized the loss as a nonbusiness bad debt subject to the capital loss limitations. On brief, the Ghidonis have abandoned their claim under section 165(c)(2) and now agree that the bad debt rules of section 166 apply. The Ghidonis argue, however, that the guarantee payment was a business bad debt incurred to avoid harm to AII, Inc.'s operations and to protect Ghidoni's reputation in the business community. Respondent counters that the Ghidonis are not entitled to an ordinary loss deduction because they have failed to establish that they were in the trade or business of lending money. However, Ghidoni need not show that he was in the *393 trade or business of lending money to prove his payment as guarantor resulted in a business bad debt. While the business of his corporation is not his own trade or business ( Whipple v. Commissioner, 373 U.S. 193, 10 L. Ed. 2d 288, 83 S. Ct. 1168 (1963)), Ghidoni could be in the trade or business of being an employee of his corporation. Shinefeld v. Commissioner, 65 T.C. 1092 (1976); Primuth v. Commissioner, 54 T.C. 374 (1970). Ghidoni was both a shareholder and probably an employee of LII, Inc. As this Court has said: It is well recognized that a taxpayer may establish the requisite business nexus for deductibility of a bad debt under section 166(a) by proof that his dominant motivation in incurring the debt was to protect his employment. United States v. Generes, 405 U.S. 93, 31 L. Ed. 2d 62, 92 S. Ct. 827 (1972); Shinefeld v. Commissioner, 65 T.C. 1092 (1976). * * *
Scifo v. Commissioner, 68 T.C. 714, 723 (1977). If, however, the taxpayer's dominant motivation for incurring the obligation was to protect his investment in the corporation, then the guarantee payment results in a nonbusiness bad debt. See United States v. Generes, 405 U.S. 93, 100-101, 31 L. Ed. 2d 62, 92 S. Ct. 827 (1972); *394 Scifo v. Commissioner, supra.Accordingly, to prevail here, Ghidoni must establish that a desire to protect his employment (the relevant trade or business under the case law) was his dominant motivation for incurring his debt. Where the bad debt deduction is attributable to payment as a guarantor of a loan, the dominant motive test is applied at the time the guarantee agreement was entered into and not at the time the guarantor is called upon to make payment. French v. United States, 487 F.2d 1246, 1248 (1st Cir. 1973); Benak v. Commissioner, 77 T.C. 1213, 1216-1217 (1981); Roussel v. Commissioner, 37 T.C. 235, 242-243 (1961). [16]
The record contains little evidence as to when or under what circumstances Ghidoni guaranteed LII, Inc.'s bank loan or as to LII, Inc.'s operations. We *395 do not choose to fill in the blanks with speculation. We have accepted Ghidoni's testimony that LII, Inc. was a start-up corporation in urgent need of a cash infusion to continue operating. However, there is no evidence that Ghidoni received any salary from LII, Inc., and it seems likely that he did not, considering the corporation's rapid plunge into bankruptcy. Ghidoni was still a student when he incorporated LII, Inc. While we would feel more comfortable if we knew the amount of Ghidoni's investment in LII, Inc., we doubt that it could have grown significantly by the time Ghidoni guaranteed LII, Inc.'s bank loan. However, the amount he invested in LII, Inc. no doubt exceeded any monies he took out of his failing corporation. Based on the totality of the circumstances, we conclude that Ghidoni's dominant motivation for guaranteeing LII, Inc.'s loan was to protect his investment whatever it was. There is certainly no evidence that he guaranteed LII, Inc.'s loan in order to protect his employment. We know that Ghidoni was the key person at AII, Inc. and that without his energy, imagination, and direction AII, Inc. would never have been successful. However, even if we were *396 to apply the dominant motive test at the time of Ghidoni's payment on his guaranty in 1976, there still would not be the necessary nexus between his payment as a guarantor and protection of his employment with AII, Inc. In fact the record does not indicate that Ghidoni ever received any salary from AII, Inc. until 1977. Also, Ghidoni had changed the corporation's name from LILI to AII, Inc. to disassociate it from the earlier Lawrence Company that had gone into bankruptcy. We are not persuaded that Ghidoni paid the $ 30,000 as a guarantor to protect the reputation of AII, Inc. or his own business reputation; he paid because he was sued by the bank on his guaranty. We certainly are not persuaded that his dominant motivation was to protect his employment as opposed to his investment in AII, Inc. On the contrary, we conclude that this was a nonbusiness bad debt, deductible only as a capital loss, as respondent determined.
Issue 6: Petitioners' 1976 Standard Deduction
Section 141(a) sets the amount of the "standard deduction" at the larger of the "percentage standard deduction" or the "low income allowance." Section 141(b) sets the "percentage standard deduction" at 16 percent *397 of adjusted gross income with a ceiling of $ 2,800 for joint return filers. Section 141(c) provides a "low income allowance" of $ 2,100 for joint return filers. Respondent observes that the Ghidonis' allowable standard deduction should be adjusted upward to the extent that we uphold respondent's adjustments for the 1976 taxable year. This is an automatic adjustment which the parties will kindly address in their Rule 155 computation. Issue 7: 1977 Schedule C Expenses
Respondent disallowed $ 24,584 in 1977 Schedule C expenses. That Schedule C identified the business as AIL, Ltd., reported total income of $ 750 and total deductions of $ 25,334. A tax return, of course, is merely a statement of the taxpayer's claim and does not establish the correctness of the figures stated therein. Roberts v. Commissioner, 62 T.C. 834, 837 (1974). We are unable to identify any other evidence relevant to this issue. Petitioners have failed to meet their burden of proof. Rule 142(a). Respondent's Schedule C expense adjustment will stand. Issue 8: 1977 Investment Tax Credits
Looking closely at the "Statement -- Income Tax Changes" attached to respondent's March *398 21, 1985 statutory notice, we can see that respondent has disallowed the $ 715 investment tax credit petitioners claimed on their 1977 return (Form 1040, page 2, line 41). Petitioners did not specifically allege error in this adjustment, even though they were represented by counsel when their petition was drafted and filed. Rather, petitioners alleged error in other specific adjustments and then placed the whole deficiency at issue, generally. Respondent's trial memorandum discussed the investment tax credit issue. Moreover, in his opening brief respondent argues that, due to a failure of proof, petitioners were not entitled to the investment tax credit in 1977. The first indication we have that petitioners challenge the adjustment appears in their reply brief. Given the warning contained in respondent's trial memorandum and the dearth of evidence on this issue, we conclude that petitioners have not met their burden of proof and are not entitled to the $ 715 investment tax credit. Issue 9: 1974 Carryback and 1975 Income Averaging
In issue 1, we reduced the amount of respondent's 1976 constructive dividend adjustment by certain funds that Ghidoni paid to Boswell since *399 those payments benefited AII, Inc. The amount or existence of any net operating loss is an automatic adjustment dependent, in part, on the level of constructive dividends we found. Since the additional income in the form of constructive dividends greatly exceeds petitioners' claimed bad debt loss, there is no net operating loss for petitioners to carry back to 1974. Similarly, for purposes of income averaging, our finding that petitioners had income, instead of a loss, in 1976 will significantly increase the 1973 and 1974 base period years for determining averageable income. Secs. 1302(a)(1); 1302(b)(2). We will leave the number crunching to the parties in their Rule 155 computations. Issue 10: 1975 General Tax Credits
Respondent determined that petitioners were entitled to a general tax credit of $ 180, an increase of $ 30 from the $ 150 they reported on their 1975 return. This adjustment is in petitioners' favor, and we sustain it as a concession by respondent without expressing any opinion thereon. Issue 11: 1974, 1975, 1976, and 1977 Fraud Additions
For the years in issue section 6653(b) provided an addition to tax equal to 50 percent of any underpayment *400 of the tax required to be shown on a return where any portion of the underpayment was due to fraud. Moreover, where a spouse had joined in filing a return, section 6653(b) relieved the spouse of liability for the fraud addition, unless a portion of the underpayment was due to that spouse's fraud. There are two elements to the fraud addition: (1) the existence of an underpayment of tax for each year in which the addition is determined; and (2) that some part of the underpayment of tax in each year was due to fraud. Petzoldt v. Commissioner, 92 T.C. at 699. As we observed above, respondent bears the burden of proving these elements by clear and convincing evidence. Henson v. Commissioner, 887 F.2d at 1525. "To carry this burden, the IRS must prove that the taxpayer intended to evade taxes that he knew or believed to be owing by conduct intended to conceal, mislead or otherwise prevent the collection of such taxes." Korecky v. Commissioner, 781 F.2d 1566, 1568 (11th Cir. 1986), affg. a Memorandum Opinion of this Court. To meet his burden of proving fraud, respondent may not rely on petitioners' failure to meet their burden *401 of disproving the underlying deficiency. Petzoldt v. Commissioner, supra.
Addressing the existence of underpayments in the taxable years in issue, we again observe that petitioners do not contest the amount of sales proceeds deposited into the Clarendon account in the Cayman Islands. Rather, petitioners contest the ownership of the sales proceeds and their characterization as dividends. As discussed above, we have found that those funds properly belonged to AII, Inc., that AII, Inc. had sufficient earnings and profits to pay dividends, and that the transfers constituted constructive dividends to Ghidoni. The evidence -- including Bender's testimony, the use of Clarendon and Ghidoni's implausible fabrications -- is overwhelming that those funds were part of AII, Inc.'s gross receipts that were not reported on either the corporate returns in 1976 and 1977 or on the Ghidonis' individual returns for those years. Accordingly, the Ghidonis substantially understated their taxable income and underpaid their taxes in each of the years 1976 and 1977. They claimed a spurious net operating loss for 1976 which they carried back to earlier years. Of course, the underpayments *402 in 1974 and 1975 flow directly from spurious net operating loss carrybacks caused by the underpayment in 1976. Fraudulent intent will never be imputed or presumed. Webb v. Commissioner, 394 F.2d at 380; Petzoldt v. Commissioner, 92 T.C. at 699. However, direct proof of a taxpayer's fraudulent intent is seldom available; therefore, fraud must be proved by the taxpayer's entire course of conduct and can, and usually must, be proved by circumstantial evidence. Spies v. United States, 317 U.S. 492, 499, 87 L. Ed. 418, 63 S. Ct. 364 (1943); Korecky v. Commissioner, 781 F.2d at 1568; Petzoldt v. Commissioner, supra.The fraud inquiry is intensely factual in nature, and we must consider the entire record in reaching our ultimate finding. Courts frequently list various factors or "badges of fraud," i.e., kinds of circumstantial evidence from which fraudulent intent can be inferred. Some of these factors are: 1) a pattern of understated income; 2) inadequate books and records; 3) failure to file tax returns; 4) implausible or inconsistent explanations of behavior; 5) concealment of assets; and 6) failure to cooperate *403 with taxing authorities. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. a Memorandum Opinion of this Court; Petzoldt v. Commissioner, 92 T.C. at 700; Meier v. Commissioner, 91 T.C. 273, 297-298 (1988). Any particular list of factors would necessarily be nonexclusive, because the fraud inquiry is dependent on the peculiar facts of each case. Moreover, there is no particular subset of these factors that will automatically trigger a finding of fraud in each case where it occurs. Viewing the record as a whole, we conclude that Ghidoni is liable for the fraud addition in each year for which it was determined. [17] *405 From AII, Inc.'s inception Ghidoni failed to keep accurate books and records from which tax returns could have been prepared. The Ghidonis failed to file their income tax returns for 1974, 1975, and 1976 until November of 1977; they timely filed their 1977 return. The funds diverted to the Cayman Islands bank account were not reported on either the corporate returns or the Ghidonis' individual returns for 1976 and 1977. Moreover, as discussed above, Ghidoni's explanation -- that the funds in *404 the Clarendon account belonged to Hassanien -- is wholly implausible and unsupported by the record as a whole. Ghidoni clearly attempted to conceal assets and unreported income, both when he falsified the information concerning his control over a foreign bank account on his 1976 and 1977 tax returns and when he repeated the lie and further denied any ownership interest in Clarendon on audit. His use of phony documents, a corporate shell, and nominees to hide his diversion scheme also indicates an attempt to conceal assets and to evade taxes. In pursuing his scheme, Ghidoni ignored Gardner's warnings concerning its illegality. Finally, his attempts to block disclosure of the BNSTC (Cayman) bank records concerning the Clarendon account evince a failure to cooperate with the taxing authority and further efforts to hide the unreported income. When these mosaic pieces are put together they reflect a vivid picture of Ghidoni's fraudulent intent to evade taxes that he knew he owed. Accordingly, we conclude that Ghidoni is liable for the fraud additions in 1974, 1975, 1976, and 1977. [18]
Mrs. Ghidoni is relieved of liability for the fraud addition, however, unless respondent proves by clear and convincing evidence that a portion of the underpayment each year was due to fraud on her part. Stone v. Commissioner, 56 T.C. 213, 227-228 (1971). The evidence is less direct and considerably more circumstantial as to Mrs. Ghidoni's intent. However, Mrs. Ghidoni was a corporate secretary and a director of AII, Inc. She worked in the AII, Inc. offices on a daily basis. She signed AII, Inc. checks in her husband's absence. More significantly, she was a signatory *406 on the Clarendon bank account in the Cayman Islands, and she was a stockholder of Clarendon. While there is no direct evidence that she was aware of the transfer of a portion of AII, Inc.'s gross receipts to the Cayman Islands bank account, it would be highly unlikely that she did not know of those fund transfers when other people in the office, such as Bender and Diane Pappas, were aware of the Cayman Islands bank account and of funds going to that account. Finally, although Mrs. Ghidoni was a signatory on that foreign bank account, she signed tax returns, under penalties of perjury, for both 1976 and 1977 answering "No" to the question as to any control over, or interest in, foreign bank accounts. All of the above facts create a strong suspicion that Mrs. Ghidoni knew or should have known about the diverted funds. She certainly benefited from the diverted funds, particularly in the new home that was built and paid for in cash. However, unlike her husband, Mrs. Ghidoni never exercised any control over Clarendon or the Cayman Islands bank account. There is some evidence that she was made a shareholder of Clarendon and a signatory over that bank account for estate planning purposes. *407 Thus, while the circumstances are highly suspicious, mere suspicion does not prove fraud, and the fact that we do not find her testimony wholly credible is not sufficient to establish fraud. Cirillo v. Commissioner, 314 F.2d 478, 482 (3d Cir. 1963), affg. in part and revg. in part a Memorandum Opinion of this Court; Shaw v. Commissioner, 27 T.C. 561, 569-570 (1956), affd. 252 F.2d 681 (6th Cir. 1958). See also Mosteller v. Commissioner, T.C. Memo 1986-505. We conclude that respondent has failed to prove by clear and convincing evidence fraud on the part of Mrs. Ghidoni. Accordingly, she is not liable for the fraud addition. Issue 12: Timeliness of Deficiency Notice for 1980
Ghidoni listed this issue as a "Central Issue" in his opening brief but requested no relevant findings and advanced no legal argument in support thereof. Petitioners filed their 1980 joint income tax return in June of 1981, and respondent sent petitioners a notice of deficiency in May of 1984. Mrs. Ghidoni did not petition the Court for the 1980 year. The deficiency notice was mailed within the 3-year limitations period *408 of section 6501(a). Respondent timely mailed the deficiency notice, and Ghidoni's complaint is not well taken. Issue 13: 1980 Income from Ghidoni Trust
Respondent adjusted the Ghidonis' 1980 income upward by $ 39,642 in disallowed depreciation and other deductions passed through from the Ghidoni Trust. Petitioner-husband contests the adjustment but provides no legal argument and points to no evidence tending to refute the determination. Petitioner-husband has failed to carry his burden of proof. Rule 142(a). Respondent's adjustment will stand. Issue 14: 1980 Charitable Contribution Deductions from Ghidoni Trust
Respondent disallowed $ 1,329 in charitable contribution deductions that the Ghidonis reported as passthroughs from the Ghidoni Trust in 1980. Petitioner-husband contests the adjustment but provides no legal argument and points to no evidence tending to refute the determination. Petitioner-husband has failed to carry his burden of proof. Rule 142(a). Respondent's adjustment will stand. Issue 15: 1980 Interest Expense Deductions from Ghidoni Trust
Respondent disallowed $ 10,625 in 1980 interest expense passthroughs from the Ghidoni Trust. Petitioner-husband *409 contests the adjustment but provides no legal argument and points to no evidence tending to refute the determination. Petitioner-husband has failed to carry his burden of proof. Rule 142(a). Respondent's adjustment will stand. Issue 16: 1980 Investment Tax Credit from Ghidoni Trust
Respondent disallowed an investment tax credit passthrough in 1980 from the Ghidoni trust. Petitioner-husband contests the adjustment but provides no legal argument and points to no evidence tending to refute the determination. Petitioner-husband has failed to carry his burden of proof. Rule 142(a). Respondent's adjustment will stand. To reflect the foregoing holdings, Decisions will be entered under Rule 155.
Footnotes
1. He also incorporated Lawrence International Manufacturing, Inc. However, for purposes of this case, no distinction need be drawn between these various Lawrence corporations.↩
2. This is one of the principal issues of fact disputed in this case, and was the subject of conflicting testimony by Bender and Ghidoni. The Court found Bender to be the more credible witness and found Bender's testimony to be more consistent with the authentic contemporaneous documentation and the record as a whole.↩
3. The Court need not decide whether these payments to Boswell were "kickbacks," as respondent contends.↩
4. While Ghidoni testified that Hassanien asked him to open this bank account, the Court did not believe his testimony. The record does not indicate that Hassanien had anything to do with this bank account. Hassanien's only contact with the Bank of Nova Scotia Trust Company was that he represented a branch of that bank in Cairo. Hassanien was never involved with the Clarendon bank account until sometime in 1982 when Ghidoni attempted to transfer the account to Hassanien in order to keep the Internal Revenue Service from obtaining the bank records.↩
5. Mrs. Ghidoni was also a signatory on the Clarendon account, but the record does not indicate that she ever exercised any control over that account. Ghidoni apparently gave her signatory authority only for estate planning purposes.↩
6. Neither Hassanien nor Moore testified, and the Court did not find Ghidoni's testimony credible. The purported agreement is not written on Taylor Moore's stationery.↩
7. The Court is satisfied that this purported agreement was either a proposal that never went into effect at all or was a phony document concocted to try to give plausibility to Ghidoni's story that the money in the Clarendon account did not belong to him but instead belonged to some nameless clients purportedly represented by Hassanien. Suffice it to say, the Court did not believe Ghidoni's story, and the credible evidence of record does not support it. Much of Ghidoni's story is based on his unsupported ex parte statements in his post-trial briefs. Those post-trial briefs put words into the mouths of witnesses who never testified, put words into Ghidoni's own mouth that he never testified to during the trial, attempt to rely on ex parte documents, and generally bear little resemblance to the case that was tried in this Court or to the evidentiary record in the case.↩
8. The testimony of Gardner and that of Ghidoni conflicted in many respects. The Court found Gardner to be the more credible witness, and based many of its findings on Gardner's testimony.↩
9. Both Gardner and Bender tried without success to get Ghidoni to set up proper books and records. When tax or accounting professionals told Ghidoni something he did not want to hear, he ignored their advice and warnings and sought out another firm. Arthur Andersen & Company finally prepared the Ghidonis' returns for 1974, 1975, and 1976, and AII, Inc.'s returns for 1974, 1975, and 1976. There is no indication that Ghidoni told that firm about Clarendon. The Arthur Andersen memorandum to the file does not mention Clarendon, and the section 482 problem that is discussed therein involved LILI and AII, Inc. rather than Clarendon and AII, Inc.↩
10. Ghidoni testified that he set up MSL and transferred Clarendon's assets to it to assure his control over the assets, because, he said, the BNSTC (Cayman) was constantly checking with Hassanien before carrying out his (Ghidoni's) instructions. The Court did not believe this testimony, though repeated by Ghidoni three times. There was never any doubt that Ghidoni controlled Clarendon and the Clarendon bank account. Moreover, transferring the assets to MSL which was held by the same three nominees as Clarendon would not have accomplished what Ghidoni claimed was his purpose. The same individual, Roger M. Davies, handled the BNSTC (Cayman) bank account for Clarendon and then for MSL. Moreover, there is no documentation in the voluminous record of this case to indicate that Hassanien was ever involved in any way with the Clarendon bank account. See supra↩, note 4.
11. Although the parties have stipulated that the Ghidoni Trust formed the AII, Ltd. limited partnership along with AIL, Inc., the limited partnership agreement itself lists Ghidoni as AIL, Inc.'s partner. Moreover, Ghidoni testified that he was AIL, Inc.'s partner. Thus, the stipulation appears to contain a harmless error. In any event, the Ghidoni Trust was a grantor trust and was thus essentially the same as Ghidoni individually.↩
12. In Bonner v. City of Prichard, 661 F.2d 1206↩ (11th Cir. 1981)(en banc), the United States Court of Appeals for the Eleventh Circuit (to which any appeal in this case would lie) adopted as precedent all decisions of the former United States Court of Appeals for the Fifth Circuit decided prior to October 1, 1981.
13. The Court simply did not believe Ghidoni's suggestion that someone at Arthur Andersen told him to lie about the existence of such a foreign bank account. However, even if that occurred, it would not excuse Ghidoni's lie. We also note that on brief Ghidoni says that his criminal case was based upon that false answer on the returns. That clearly is not the fact. The material matter in the false return charged under section 7206(1) was reporting total income of $ 51,623 "whereas, as he then and there well knew and believed, his total income was substantially in excess [of that amount]."↩
14. AII, Inc.'s tax liability is not before us, so we need not characterize this payment or adjudicate its deductibility. See supra↩, note 3.
15. In addition to the funds transferred to the Clarendon account, respondent also determined that AII, Inc. directly paid some personal expenses for the Ghidonis which constitute additional constructive dividends. There is no evidence in the record as to these items, and we sustain respondent's determination.↩
16. See also Estate of Allen v. Commissioner, T.C. Memo 1982-303; Baker v. Commissioner, T.C. Memo 1981-137↩.
17. For 1976 and 1977, the fraud is direct. For 1974 and 1975, the fraud is related to the spurious net operating loss that was claimed for 1976 and carried back to earlier years. However, the Ghidonis filed all of their returns for 1973 through 1976 at the same time, along with their claims for the refunds from the spurious net operating loss. Here, the fraud addition is equally applicable to all years in which it was determined. The causal link is sufficiently close to find a deficiency due to fraud where the deficiency is caused by a carryback or carryover of a fraudulent net operating loss. Hall v. Commissioner, T.C. Memo 1990-244; Toussaint v. Commissioner, T.C. Memo 1984-25, affd. 743 F.2d 309 (5th Cir. 1984). See also Arc Electrical Construction Co. v. Commissioner, 923 F.2d 1005 (2d Cir. 1991), revg. T.C. Memo 1990-30↩, where the Court of Appeals for the Second Circuit extended this reasoning to a 1977 jobs credit which was itself legitimate but which only became available to be applied in 1974 because the taxpayer had fraudulently understated its 1977 tax liability.
18. Petitioner is estopped to deny that he wilfully and knowingly filed his 1977 Form 1040 which he did not believe to be true and correct as to every material matter "in that he reported total income of $ 51,623; whereas, as he then and there well knew and believed, his total income was substantially in excess of the amount heretofore stated." Wright v. Commissioner, 84 T.C. 636, 643-644↩ (1985). This is another factor that can be weighed along with all of the other facts and circumstances.