Kenneth M. HENSON and Sue B. Henson, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 88–8678.

United States Court of Appeals, Eleventh Circuit.

Nov. 13, 1989.

Rehearing and Rehearing In Banc Denied Dec. 22, 1989.

Frank C. Jones, King & Spaulding, Michael Eric Ross, Atlanta, Ga., for petitioners.

William S. Rose, Jr., Asst. Atty. Gen., Tax Div., U.S. Dept. of Justice, William F. Nelson, Chief Counsel, Gary R. Allen, Chief, Appellate Section, Jonathan S. Cohen, Mary Frances Clark, Washington, D.C., for respondent.

Before CLARK and EDMONDSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

This is an appeal from a tax court determination that appellant Henson was liable for the civil tax fraud 50 percent penalty for the 1974 tax year.[1]

The case is before the Court for the second time. *See Henson v. CIR*, 835 F.2d 850 (11th Cir.1988). On the former appeal, we remanded a similar decision by the tax court for reconsideration in light of certain determinations which we then made.

## I. COURSE OF PROCEEDINGS

The Commissioner of Internal Revenue determined a deficiency in Henson's income tax for the tax year 1974 and proposed a 50 percent addition to the tax under Section 6653(b) IRC, 26 U.S.C. § 6653(b), for fraud. Henson petitioned the tax court for a review of this determination. Unless the finding of fraud was established, the statute of limitations for collecting the tax deficiency for 1974 would have expired.

The tax court made its memorandum findings of fact and opinion. *See* T.C. Memo 1986–303. It decided that: "Respondent's (Commissioner's) determination disallowing the loss on the purported sale of the stock and the addition to tax for fraud under Section 6653(b) are sustained for 1974."

Taxpayer appealed to this Court on the tax court decision and we vacated "that part of the opinion finding fraud in 1974" and remanded the case to the tax court "so that it may reconsider the case, viewing Long as a very biased witness and accepting that there is no evidence that the letter and promissory note *did not exist* in 1974." (Emphasis added).

In the opinion, the tax court, after detailing the testimony of one Albert Long on which the court largely relied, had stated: "We found no evidence of bias against Henson." The court also found that a letter and a promissory note dated December 11, 1974 were not signed by Long in 1974.

---

1. It is conceded by the appellee that the fraud addition does not apply to Mrs. Henson, whose interest is only by reason of having filed joint returns and a joint petition in the tax court.

On remand, the tax court reviewed the record, as directed by this Court, and concluded that although there was a basis for finding Long biased, it nevertheless credited Long's testimony and refused to credit the opposing testimony of taxpayer Henson. The court, therefore, reaffirmed its earlier decision upholding the fraud determination.

## II.  STATEMENT OF FACTS

Accepting Long's testimony as true, the tax court found, among others, the following facts:

At the time the petition was filed, petitioner was a resident of Columbus, Georgia.  Petitioner filed a joint federal income tax return with his wife for the year 1974 reporting income and expenses on the cash method of accounting.

Henson is, and for many years has been, a lawyer engaged in private practice specializing in litigation with offices in Columbus, Georgia.  Henson has some degree of familiarity with the law of Federal income taxation.  During the period involved, he was aware of the distinction between ordinary income and capital gains and the basic elements of a wash sale under section 1091(a), including the 30–day period.

### A.  *American Family Corporation Stock Sale*

American Family was organized in 1955 with Henson as one of the original subscribers.  From time to time thereafter he purchased additional shares of stock.  Some time prior to 1974 he became general counsel to the corporation.  By December 11, 1974, Henson had accumulated at least 39,600 shares of American Family common stock.

Prior to 1974, Henson had become a stockholder in several small loan companies, including Alco Finance, Inc. (Alco).  The president and chief executive officer of Alco was Albert D. Long who owned 50 percent of the outstanding stock.  The remaining stock was divided equally between Henson and George B. Smith.  Alco had been in business since 1968.  During 1973 or early in 1974 there were discussions between Long, Henson, and others with respect to the desirability of expanding the business of Alco through the acquisition of one or more other small loan companies.  Such an acquisition would require the formation of a holding company, so that each small loan company could maintain an independent existence.  It was recognized that Long, Henson, and Smith would have the same stock interest in such a holding company as they had in Alco.  Without direct authorization from Long, G. David Stapleton III (now deceased), a lawyer in Henson's law firm, prepared incorporation papers for a proposed holding company named Alco Industries, Inc. (Alco II).[2]  Stapleton requested Long by telephone to visit his office to sign the incorporation papers, which Long did prior to June 7, 1974.  During the telephone conversation or the office visit Long informed Stapleton or Henson, or both, that expansion of Alco was not feasible at that time and Long had no need for and did not want the new corporation.  Long was advised that Henson wanted or could use the corporation.  Hence, Long was willing to sign the documents.[3]  Alco II was actually incorporated on June 10, 1974.  The incorporation papers show the sole incorporator to be Long, its initial

---

2.  In its first opinion, the tax court referred to this corporation as Industries.  In its second opinion, it used the term Alco II to conform with this Court's use of the term.  We now use the term ALCO II throughout for Alco Industries.

3.  He signed whatever documents he was asked to sign.  He testified as follows:

> Q:  Did you look at these documents when you were signing them?
> A:  I read three or four and then I asked him if all of these were minutes and stuff like that.

And he said yes.  And I said, "Well I don't have time to sit down and read all of these.  I'm going to take you at your word and sign them."

So he just showed me where to sign and I signed.

> Q:  If you didn't have—or had very little to do with Alco [II], why did you sign these documents?
> A:  Well, I thought it was the original forming of Alco [II] and I was doing it to help Mr. Henson out.

board of directors to be Henson, Long, and Stapleton, and the initial registered office to be the office of Henson's law firm.

The minutes of the organizational meeting of the directors of Alco II are dated June 15, 1974, and are signed by Long, Henson, and Stapleton. The minutes are, however, incomplete in that paragraph 3, which is intended to designate the individuals elected to the several offices of the corporation, omits the names of the officers. The initial share subscription agreement is signed by Long, individually, and by him on behalf of Alco II and recites that Long subscribed for 1,000 shares for the consideration of $1,000. An undated document signed by Long for the board of directors offers subscription rights to Messrs. Smith and Henson for 500 shares each. By document dated June 20, 1974, Henson and Stapleton resigned as officers and directors leaving Long as the sole member of the initial board of directors. Certificate Number 1 for 1,000 shares of Alco II stock is dated June 15, 1974, and is signed by Long as president and Stapleton as secretary and shows Albert D. Long as the shareholder. The assignment printed on the back of this certificate is signed by Long in blank without a date inserted.

Next in point of time is a corporate document styled Meeting of Directors of Alco II dated December 1, 1974 and signed by Long as president and director which recites that Alco II was formed for the purpose of purchasing either Swift Loan and Finance Company or Swift Loan and Finance of Columbus, Inc. (referred to collectively as the Swift Loan Companies), that substantial corporate credit is needed to effect the purchase, and that Henson has expressed willingness to sell his shares of capital stock of American Family to Alco II, which shares of stock would provide Alco II with the needed credit. The record also includes a purported exchange of correspondence (discussed *infra*) between Henson and Long as president of Alco II.

There is a letter dated December 11, 1974 to Long from Henson which purports to confirm the sale by Henson of 39,276 shares of American Family stock to Alco II for a total purchase price of $157,104.[4] The consideration is an unsecured promissory note of the same date in that amount signed by Long as president of Alco II. Henson's letter recites that the American Family stock may be used by Alco II to collateralize any loan procured to facilitate the purchase of either of the Swift Loan Companies or the assets of either. Henson retained an option to repurchase the American Family stock after 30 days and up to 90 days from sale at the same price, provided an agreement for the acquisition of the assets or the stock of either of the Swift Loan Companies had not been made. Alco II was also given the right to demand repurchase of the stock at the same price during that same period. The letter has endorsed on it an acknowledgement by Alco II of the purchase, signed by Long on behalf of Alco II.

A second letter from Henson to Long as president of Alco II, dated February 22, 1975, confirms a mutual agreement to repurchase the shares in view of the fact that Long has determined not to make any effort to purchase the stock or assets of either of the Swift Loan companies. This letter was also signed by Long as president of Alco II. The note purportedly given by Alco II to Henson dated December 11, 1974, to reflect the American Family stock purchase price has endorsed on it the words "Paid & surrendered 2/22/75 Kenneth M. Henson."

The two letters from Henson to Long, the Alco II note, and the December 1, 1974 minutes of Alco II's directors were drafted by Henson rather than by Stapleton and were typed by Henson's secretary on or about the dates of the documents. All of the corporate papers pertaining to Alco II remained in Henson's law office files until some time during the year 1976.

---

**4.** Such a sale at that time would have generated a long-term capital loss to Henson of $177,-
351.48.

In order to complete the purported sale of American Family stock to Alco II, Henson personally delivered a stock certificate for 39,600 shares to American Family which reissued a new certificate for 39,276 shares in the name of Alco II. This certificate is dated December 17, 1974 and was registered by Columbus Bank and Trust Company as registrar on December 18, 1974.[5] The reissued certificate together with a certificate issued in Henson's name for 324 shares were delivered to Henson's office, on or shortly after December 18, 1974. A certificate for 39,276 shares retransferred to Henson was delivered to Henson shortly after May 12, 1975, which is the date on which it was processed for retransfer by American Family. American Family had no contact with Long or Alco II except that, in March 1975, a dividend check in the amount of $2,356.56 was issued in the name of and mailed to Alco II at the address of Alco. At Henson's request this check was endorsed by Long and delivered to Henson. When Long asked about the dividend check having been sent to Alco II, Henson told Long something to the effect that he intended to cheat on his taxes.

Long remembers signing Alco II documents at the request of Stapleton on only two occasions, once during 1974 and once during 1975. On each occasion, Long went to Stapleton's office and signed whatever documents Stapleton requested without paying attention to their contents. The first occasion obviously took place prior to the date of incorporation and must have occurred in May or early June 1974. The occasion of Long's second visit to Stapleton must have taken place prior to May 12, 1975, since that was the approximate date of the retransfer of the American Family shares to Henson on the books of American Family. It is not certain on what date or dates the execution of the documents relative to the alleged sale of American Family shares to Alco II and the alleged repurchase occurred. The tax court stated:

We can only find that the execution of those documents by Long did not take place in December 1974.[†] The sale and repurchase documents may have been executed by Long prior to June 10, 1974, some time in 1975 but prior to May 12, 1975, or in part on the earlier date and in part on the later date.

[†] We rely upon Long's testimony for this conclusion and decline to accept Henson's testimony that these documents were signed by Long in December 1974.

The purported sale of American Family stock to Alco II was not mentioned or discussed by anyone with Long, and Long was not aware that it had taken place, until March 1975 when he received the American Family dividend check payable to Alco II. *Long was not aware of the December correspondence from Henson or the purported plan to use Henson's American Family stock as collateral for loans to provide funds to purchase the stock or assets of either of the Swift Loan Companies until shown the documents by Internal Revenue agents in 1976.* Long never agreed with Henson that he (Long) would in any capacity attempt in December 1974 or early 1975 to purchase the assets or stock of either loan company. Long was not able to effect such a purchase in whole or in part for his own account and he did not participate in the organization of Alco II in order to provide a vehicle for his efforts to effect such a purchase. No attempt was made by Long in December 1974 or in January or February 1975 to negotiate such a purchase with the owner of either loan company. Neither was any such attempt made by Henson. *Long was not aware during 1974 or 1975 that on behalf of Alco II* he had signed either the December 11, 1974 or the February 22, 1975 letter and he did not affix his signature to the December 11, 1974 letter or the December Alco II promissory note during December 1974.

Finally, the tax court made the following factual findings:

The purported sale by Henson of the American Family shares to Industries did

5. The transfer clerk testified that Long had expressly directed her to send the reissued certificate in the name of Alco II to Henson.

not, in fact, take place. It was structured by Henson so that at all times control of the American Family shares remained with him and he was assured the ability to repurchase the shares at the alleged sale price. Alco II had no business or other reason to purchase the American Family shares and did not do so. The sole objective of the purported transaction was Henson's desire to realize a substantial tax loss to offset a capital gain in excess of $200,000 realized by him on a sale of some stock in an unrelated corporation which occurred on January 4, 1974. At the time Henson signed and filed or caused to be filed petitioners' 1974 Federal income tax return on which he claimed a long-term capital loss on the sale of 39,276 shares of American Family stock in the amount of $177,351.48, *he knew that this sale had not taken place, that the documents purporting to reflect the sale were fictitious, and the sale transaction a sham.*

### B. *What Evidence do we Consider?*

Being bound, as we are by the law of the case, we must disregard any findings by the tax court that are foreclosed by the prior decision in the case. Specifically, this Court remanded the case to the tax court with the condition that the tax court accept the fact "that there is no evidence that the letter and the promissory note did not exist in 1974." The letter referred to was dated December 11, 1974 and was addressed to Albert Long as president of Alco II and it bore his signature in acknowledgement. The promissory note was also dated December 11, 1974 and was signed by Long as president of Alco II.

The first question we must decide is what was meant by our statement that there was no evidence that the documents "did not *exist* in 1974." This Court may have meant that there was no evidence that the documents had not even been typed, thus did not exist, or it may have meant that there was no evidence that the documents had not been signed by Long (executed). It was really undisputed that they had been typed by Henson's secretary on

December 11, 1974, and thus they did "exist," but the tax court had found that they had not been "executed" in 1974. On remand, the tax court assumed that this Court intended the word "exist" to mean fully executed. We accept that construction.

The next question is whether the court's statement that there was no evidence that the documents did not exist in 1974 precluded the tax court from finding that there was such evidence after the court, following our instruction to "reconsider all the information in light of Long's bias," expressly found in favor of Long's credibility. The tax court believed that upon its credibility choices, expressly finding again in favor of Long's credibility and explicitly stating that it did not credit Henson's credibility, it was not foreclosed from considering *all* of Long's testimony, giving such weight to it as it thought appropriate.

This seems to be a proper construction of our language. Otherwise, we would not have directed the tax court to "reconsider *all* the information in light of Long's bias." (Emphasis added). It was Long's testimony that convinced the tax court that the letter and promissory note dated December 11, 1974 were not signed during the 1974 tax year. This was certainly part of the "information" referred to in our opinion, which we directed the tax court to reconsider in light of Long's bias. We, therefore, review the tax court's findings of fact without any of Long's testimony being precluded by our earlier opinion. All of the facts set out above, therefore, are before us to review by the clearly erroneous standard.

### III. STANDARD OF REVIEW

While the burden is on the taxpayer to overcome the presumption of correctness of the Internal Revenue Service's determination of a deficiency, the burden is on the Commissioner to establish the determination of fraud under Section 6653(b) by clear and convincing evidence. *Mitchell v. Commissioner of Internal Revenue,* 89 F.2d 873, 878, n. 2 (2d Cir.1937), citing *Oriel v. Russell,* 278 U.S. 358, 364, 49 S.Ct.

173, 174, 73 L.Ed. 419 (1929); and *U.S. v. Regan*, 232 U.S. 37, 46–48, 34 S.Ct. 213, 216–217, 58 L.Ed. 494 (1914). We are thus required to determine whether the taxpayer's findings of fact which are not clearly erroneous establish the proof of fraud by clear and convincing evidence.

## IV. DISCUSSION

### A. *Long's Credibility Findings*

■ The tax court, on remand, stated that when it used the expression in its first opinion: "We find no evidence of bias against Henson,"

We intended that statement to reflect our assessment of Long as a witness in the case. It was a short hand way of stating that, irrespective of the controversy and bad feelings between Long and Henson, Long was, in our judgment, a truthful witness.

The court then said:

After a careful review of the record we again reach the same conclusion. Although Long had reason to be biased, we still believe his testimony was truthful and credible.... During the trial and in reaching our opinion in this case we exercised our judgment as the trier of fact. We judged the credibility of each witness in turn, especially Long and Henson. We have now reviewed this record and confirm our judgment as to Long and Henson.

After noting the existence of two lawsuits filed by Henson against Long, the tax court stated:

We knew that we would be required to form a judgment as to Long's credibility, including the difficult task of discerning whether his testimony was colored by ill will toward Henson. For this reason we observed the demeanor of Long when testifying with extra care. We listened to his tone of voice; we observed the expression on his face and his manner used in responding to questions. We even recalled Long towards the end of the trial in order to interrogate him spe-

cifically as to several of the critical documents. At that time we reminded him of the importance of his testimony and received his assurance that he was giving us his recollection. Long, in our judgment fully recognized the delicacy of his position as a key witness and made a conscientious effort to give an accurate account of relevant facts.

On the other hand, the tax court stated as to Henson's opposing testimony: "We simply give no credit to Henson's testimony under oath with respect to this purported sale."

As the Court of Appeals for the Fifth Circuit has said: "We are especially reluctant to find clear error in a lower court's credibility choices." *Marsellus v. CIR*, 544 F.2d 883, 886 (5th Cir.1977).[6]

### B. *On the Merits*

As we have noted, the Commissioner must carry the burden of proving fraud by clear and convincing evidence. After carefully reading the tax court's two opinions, including their two extensive findings of fact, and the entire testimony of both Long and Henson, we conclude that the Commissioner has adequately carried this burden of proof.

### 1. *Validity of the Sale*

■ To begin with, the tax court held that the purported sale of American Family stock by Henson to Alco II was a sham. This was, of course, a finding of fact. *Mitchell v. Commissioner*, 89 F.2d 873 (2d Cir.1937). We may not overrule this finding unless we conclude that it was clearly erroneous.

Far from finding this holding clearly erroneous, we find it more than adequately supported by the underlying facts.

The facts as found by the tax court, based largely on the testimony of Long which the court credited, demonstrate that the organization of Alco II, the purported sale by Henson of 39,276 shares of American Family stock to Alco II and the agree-

---

**6.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), this Court adopted as

precedent all of the decisions of the former Fifth Circuit decided prior to October 1, 1981.

ment between Henson and Alco II to repurchase the stock the following year were not a bona fide transaction. Long testified that he was not interested in formation of Alco II, but that since Henson told him he would like to have a holding company he, Long, agreed to sign whatever documents Henson requested of him in connection with that transaction. He testified repeatedly that he knew nothing about the actual organization of Alco II, other than signing some of the incorporation papers at Henson's request, until March of 1975 when he received an unexpected dividend check from American Family, payable to Alco II and sent to Long's address. When Long, not knowing anything about the actual organization of Alco II, asked Henson what it was all about, Henson told him that the dividend really belonged to him and he turned off Long's inquiry by saying something about intending to cheat on his Federal taxes.[7] Moreover, a year later, Henson requested Long to sign two documents that purportedly had been signed at the time of the incorporation of Alco II. Long agreed to, and did sign the stock subscription for the 1,000 shares of stock for which Alco II was incorporated but he refused to sign the promissory note for $1,000 that Henson sent him in payment of the stock. He returned the signed stock subscription to Henson in 1977. It had been dated June 15, 1974 when it was sent to him by Henson.

As pointed out above, the tax court found:

> The purported sale of American Family stock to Alco II was not mentioned or discussed by anyone with Long, and Long was not aware that it had taken place, until March 1975 when he received the American Family dividend check payable to Alco II. Long was not aware of the December correspondence from Henson or the purported plan to use Henson's American Family stock as collateral for loans to provide funds to purchase the stock or assets of either of the Swift Loan companies until shown the documents by Internal Revenue agents, long after the taxable year. Long never agreed with Henson that he (Long) would in any capacity attempt in December 1974 or early 1975 to purchase the assets or stock of either loan company.... And he did not participate in the organization of Alco II in order to provide a vehicle for his efforts to effect such a purchase.... Long was not aware during 1974 or 1975 that on behalf of Alco II he had signed either the December 11, 1974 or the February 22, 1975 letter and he did not affix his signature to the December 11, 1974 letter or the December Alco II promissory note during December 1974.

Thus, accepting as true, as the tax court did, Long's testimony, as to these events, there can be no question about there being clear and convincing evidence that Henson had set up a sham sale solely for the purpose of taking a deduction for a long-term capital loss to partially offset a $200,000 capital gain realized in a different transaction.

### 2. *Proof of Fraudulent Intent*

■ The tax court found that Henson was somewhat knowledgeable about Federal taxation, and he himself testified that he understood the effect of the tax provision disallowing a wash sale. Besides, for Henson to set up this sham sale, knowing it not to be genuine and claiming the tax benefit from it as if it had been a genuine sale, is ample evidence of a fraudulent intent. Moreover, we have his statement that the Alco II skeleton corporation was in some way connected with his intention to cheat on his taxes.[8]

---

7. Long's testimony as to this statement was:
   Q. Did Mr. Henson make any other statements at the time you handed him the check?
   A. Well, when he was walking off, I said, "What's this all for? What's that for? And he just made the statement—he said, "Well, I'm just going to screw off on a little taxes."

8. We are also in agreement with the tax court's statement:
   > It is at least hypothetically possible that Henson could have persuaded Long to cause ALCO or Alco II to enter into this highly conditional purchase in order for Henson to realize his tax loss and then to negotiate for acquisition of the Swift companies. But we

Thus, there can be no question that the tax court could properly find that the Commissioner had carried his burden of proving fraud by clear and convincing evidence.

## CONCLUSION

The judgment of the tax court is AFFIRMED.

believe that had this happened, Henson would have made sure that such negotiations took place. Evidence confirming such facts would have been introduced at the trial, but there was none. Henson would not, in our judgment, transfer more than $150,000 in securities to Long in return for an unsecured worthless promissory note in order to permit Long to open negotiations, and then fail to follow up with Long for more than 2 months, as Henson testified. Such conduct was, in our judgment, uncharacteristic of the successful and experienced lawyer which Henson was and is.