668 A.2d 1013

**GENIE & COMPANY, INC.**

v.

**COMPTROLLER OF the TREASURY.**

**No. 467, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

Dec. 29, 1995.

Mark A. Lechowicz (Lechowicz & Davis, on the brief), Glen Burnie, for Appellant.

Gerald Langbaum and John K. Barry, Assistant Attorneys General (J. Joseph Curran, Jr., Attorney General, on the brief), Annapolis, for Appellee.

Submitted before WENNER, HARRELL and MURPHY, JJ.

HARRELL, Judge.

In this case, we are called upon to clarify the application of a statutory civil penalty imposed by the Comptroller of the Treasury ("Comptroller") for intentionally filing a false tax return, as set forth in Md.Tax–Gen.Code Ann. ("TG") § 13–

703.[1] Responding to that call, we hold today that the statute must be interpreted as requiring that the Comptroller, in order to invoke the penalty provision, prove by clear and convincing evidence that a false return was filed with fraudulent intent. Furthermore, we hereby incorporate certain "badges of fraud," currently used by federal courts when interpreting an analogous Internal Revenue Code section, into the body of Maryland caselaw in order to facilitate the related determinations of whether, and to what extent, the penalty should be assessed against a taxpayer.

Appellant, Genie & Company, Inc. ("Genie"), appeals from a judgment by the Circuit Court for Anne Arundel County, affirming an order of the Maryland Tax Court that assessed a 50% penalty on taxes owed by appellant for intentionally filing false returns. Appellant presents two issues for our consideration, which we have reorganized and rephrased for analysis as follows:

I. Did the evidence presented before the tax court support a finding that appellant should be assessed a 50% penalty for the alleged fraudulent filing of false tax returns?

II. Was appellant denied meaningful judicial review of the tax court's decision by the circuit court?

## FACTS AND PROCEEDINGS BELOW

### A. APPELLANT

Genie is a Maryland corporation engaged in the business of selling diesel fuel. During the period at issue in this case, it sold diesel fuel off-site in bulk to commercial customers as fuel for trucks and buses, to other customers for home heating purposes, and from on-site metered pumps at a retail service station in Anne Arundel County. Mr. Robert Calvert was Genie's general manager. In the twenty years before Mr.

---

1. TG § 13–703 states, in pertinent part:

 If, with the intent to evade the payment of tax, a person, including an officer of a corporation, or a governmental unit makes a false tax return, the tax collector shall assess a penalty not exceeding 100% of the underpayment of tax.

Calvert began to work for Genie, he was employed in the home heating fuel industry. Once hired by Genie, Mr. Calvert's specific duties included signing the monthly tax returns submitted to the Comptroller's office, ordering the fuel from suppliers, selling the fuel to customers, and monitoring the operation of the service station. In addition, Mr. Calvert testified on behalf of Genie in the proceedings before the tax court.

### B. THE MOTOR FUEL TAX

Maryland imposes a sales tax upon motor fuel. TG § 9–302. Diesel fuel is one of several types of "special fuel," as defined by TG § 9–101(g). During the relevant period at issue in this case, diesel fuel was taxed at the rate of eighteen and one-half cents ($0.185) per gallon. TG § 9–305(3)[2] There are, nevertheless, certain exceptions under the tax scheme. Diesel fuel is not taxed when it is delivered into a storage tank and used only for heating or when it is used for any purpose other than vehicle propulsion. TG § 9–303(b). In addition, certain other users of diesel fuel are entitled to purchase the fuel without paying a tax, provided that entity has been given an exemption certificate by the Comptroller, expressly authorizing the acquisition of special fuel without paying the motor fuel tax. *See* TG §§ 9–319, 9–322. The exemption certificate is required to be conspicuously displayed by the exempt party. TG § 9–324. The "cost" of the motor fuel tax is typically borne by the ultimate user or re-seller of the fuel, but under the statutory framework, it is to be collected, reported, and remitted to the Comptroller by the special fuel seller on a monthly basis. TG §§ 9–308, 9–314(b)(1), (d). It is undisputed that Genie was a "special fuel seller" within the meaning of TG § 9–301(g), (s).

### C. THE AUDIT AND THE ASSESSMENT

In the latter part of 1988, an inspector for the Motor Fuel Division of the Comptroller's office noticed that Genie was

---

**2.** TG § 9–305(3) has subsequently been amended to reflect increased tax rates.

selling taxable fuel to a customer, but it was subsequently revealed that the customer was not listed on Genie's monthly tax return covering the period of the sale. This omission triggered an internal audit by the Comptroller of Genie's motor fuel sales, encompassing the period from 1 November 1988 until 31 May 1991. Part of the audit consisted of comparing the volume of fuel delivered to Genie each month by its suppliers, as contained in the suppliers' reports to the Comptroller, with Genie's monthly reports indicating its sales volume and the names of its customers. The Comptroller determined from Genie's invoices whether the customers had exemption certificates on file or whether the sale was clearly for an exempt home heating use. If so, the sales were considered non-taxable, and were accordingly subtracted from the taxable sales volume. The Comptroller then proceeded to verify whether all of the required taxes were paid on the sales.

During the audit period, on 3 July 1990, Genie was served an administrative subpoena by the Comptroller to produce its records of diesel fuel transactions. Thus, Mr. Calvert became aware of the audit at some point before it was completed.[3] The Comptroller asserts that knowledge of the continuing audit resulted in a dramatic increase in the number of gallons reported by Genie. Appellant, on the other hand, contends that the increase in the reported taxable sales volume was due to the expansion of its business to include numerous commercial accounts in 1990 and 1991.

The initial audit performed by the Comptroller reflected that the amount of actual taxable sales volume was 1,071,077 gallons, and not the 541,740 gallons that Genie reported, as reflected in the following table (taken from the Comptroller's Audit Schedule of Differences, which was part of the record before the tax court):

---

3. Mr. Calvert testified at the tax court hearing that one of his customers first brought it to his attention that the State was performing an audit upon Genie. Mr. Calvert was unable to remember the exact date that he was notified.

| MONTH | GALLS.<br>RPTD. | AUDIT<br>AMOUNT |
|---|---|---|
| December 1988 | –0– | 6,242 |
| January 1989 — February 1990 (14 months, inclusive) | –0– | 59,796 |
| March 1990 | 2,000 | 35,996 |
| April 1990 | –0– | 18,324 |
| May 1990 | 1,925 | 37,377 |
| June 1990 | 3,926 | 41,135 |
| July 1990 | 7,508 | 45,037 |
| August 1990 | 9,488 | 65,285 |
| September 1990 | 27,026 | 44,609 |
| October 1990 | 38,075 | 76,767 |
| November 1990 | 36,844 | 74,288 |
| December 1990 | 48,453 | 75,626 |
| January 1991 | 35,565 | 68,112 |
| February 1991 | 60,328 | 88,841 |
| March 1991 | 74,479 | 96,778 |
| April 1991 | 67,161 | 77,568 |
| May 1991 | 128,962 | 159,296 |
| **TOTALS** | 541,740 | 1,071,077 |

The resulting amount of calculated "under-reporting" was 529,337 gallons, and, at eighteen and one-half cents per gallon, represented $97,927.35 in unpaid taxes. Interest was added to that figure, and additionally, at the time the audit was completed, the Director of the Motor Fuel Tax Division determined that a 100% fraud penalty, pursuant to TG § 13–703, should be imposed against Genie.

The results of the completed audit were reviewed with Genie's representatives. Thereafter, Genie requested an internal review of the audit. After an informal hearing which resulted in a 14,000 gallon reduction in the amount of the deficiency, a final assessment by the Comptroller was issued.

## D. THE TAX COURT PROCEEDINGS [4]

Genie appealed the assessment to the Maryland Tax Court, where a hearing was held on 29 October 1992. During the hearing, the tax court permitted the case to be continued, allowing Genie the opportunity to prepare a comprehensive written document of the fuel sales it made, on a monthly basis, to each of its customers on whose accounts the Comptroller alleged that tax was unpaid during the audit period. Genie prepared the document, which was entered into evidence when the hearing resumed on 18 May 1994.

The principal witnesses at the 18 May 1994 hearing were Mr. Calvert, testifying on behalf of Genie, and Mr. William Turner, who was, at the time of the audit, the Chief Auditor of the Motor Fuel Division of the Comptroller. Mr. Calvert testified that the figures submitted by Genie were accurate. His testimony indicated that the off-site sales on which he had not charged and remitted the fuel tax, but which the Comp-

---

4. A number of issues were appealed to the tax court in this case, including the amount of tax owed from the on-site fuel pumps. Inasmuch as the only issue properly raised by this appeal deals with the propriety of assessing the penalty for filing a fraudulent return, our review of the tax court proceedings will be limited accordingly.

troller treated as taxable, were primarily made to five large commercial customers. Because Mr. Calvert's reasoning for why tax was not collected and paid on these accounts is critical when determining the propriety of the penalty for the alleged intentional filing of false tax returns, we shall review the explanations that he provided for each customer.

One such customer was Dillon's Bus Company ("Dillon's"). Mr. Calvert testified that "all the way up until [the] investigation started," he believed Dillon's was tax exempt "[b]ecause so many of the bus vendors that we deal with are tax exempt." Another customer was "Kahn," an excavator. Mr. Calvert testified that he believed Kahn was exempt because Mr. Kahn was a minority, listed with the State of Maryland,[5] and because the company that he worked for, Reliable Contractors, was a tax exempt company. The third customer was Gunther's Charters. Mr. Calvert testified that he believed it was exempt because "Gunther" was "a transportation person with [S]tate contracts." Taxes were also not remitted by Genie for a period of time on their account with B & C Bus Company ("B & C"). Mr. Calvert did not specifically offer a reason why he believed B & C to be tax exempt, but it can be inferred from his testimony that he harbored such a belief because they were exclusively a school bus company. The fifth customer was Cunningham Excavating ("Cunningham"). With respect to this account, Mr. Calvert testified that he was aware that they were not a tax exempt company. The reason taxes on this account were not kept current, however, according to Mr. Calvert's testimony, is because Genie "thought [it was] supposed to pay the taxes when [it] collected them," and Cunningham's account was in arrears for over a year, in some instances.

Mr. Calvert testified further that he was not aware that "there was such a thing" as exemption certificates for *purchasers* when the audit began, even though he acknowledged

---

5. We presume, because the record is unclear, that Mr. Calvert was referring to some sort of Minority Business Enterprise list maintained by the State.

that Genie had obtained a *seller's* exemption certificate before the onset of the audit. In addition, he claimed to have no knowledge of the monthly reporting and return requirements contained in TG §§ 9–308 and 9–309 until late 1989, when Genie first began to file reports with the Comptroller. Essentially, while Mr. Calvert did testify that he realized at the time of the 18 May 1994 hearing that some additional tax should have been paid by Genie on the five customers at issue, the reason for Genie's failure to pay the taxes was due to ignorance, inadvertence, or neglect of the specific requirements of the motor fuel tax laws, and not deliberate under-reporting with the intent to evade taxes.

Mr. Turner testified that following the review of the documentation provided by Genie in contemplation of the continued hearing before the tax court, the amount of under-reported sales on which tax was still owing was reduced to 403,327 gallons, or $74,615.50. He testified further that the reasons for imposing the 100% penalty for fraud included that: (1) the number of gallons reported by Genie increased dramatically after the 3 July 1990 subpoena was served; (2) Mr. Calvert was a veteran in the oil business who should have been knowledgeable regarding the applicable taxes; and, (3) the audit disclosed that the amount of unreported gallons was nearly equal to the amount of reported gallons. Mr. Turner acknowledged that Mr. Calvert had a poor reputation in the Comptroller's office, but stated that Mr. Calvert's reputation did not affect the decision to impose the 100% penalty.

The tax court heard closing arguments and, after a brief recess, issued an opinion and order from the bench. The court found "Mr. Calvert's testimony less than credible," stating specifically:

> It's very difficult for the court to believe … that Mr. Calvert did not know he needed a tax exempt number for certain entities…. And I also do not think that it's just coincidental that Mr. Calvert tried to clean up his documentation with the Comptroller after he received word of the Comptroller's investigation. I'm also not convinced that Mr. Calvert really believed that he did not have to pay the

Comptroller until Cunningham paid Genie. That's difficult for the court to accept. I would think that someone in this business as long as he's been in the business should know or should have known, especially when you're dealing with such large gallons—amounts of gallons of fuel, that those reports must be accurate. And at best, from Mr. Calvert's standpoint it's a very bad case of documentation. But I'm not sure that it's just that. And I think that there's a standard that he's required to be responsible for. And I think that there's little question in my mind that [TG §] 13–703 has in fact been violated. And I think that a penalty is certainly necessary in this case. Because I believe that a false return was reported or filed. And that Mr. Calvert knew that some of those numbers were incorrect. . . .

On the other hand, the tax court found Mr. Turner's testimony and documentation "acceptable." Accordingly, the tax court utilized Mr. Turner's finding that Genie's tax liability from the bulk sales was $74,615.50. On the issue of imposing the statutory penalty, the tax court was not persuaded that a 100% penalty was called for, finding it "a little harsh." Instead, the tax court reduced the penalty to 50% of the bulk sales deficiency, or $37,307.75. A final written order was signed on 15 July 1994, reflecting the above figures.[6]

### E. JUDICIAL REVIEW IN THE CIRCUIT COURT

On 12 August 1994, Genie sought judicial review of the tax court's decision in the Circuit Court for Anne Arundel County. The record amassed in the tax court was transmitted to the circuit court, and memoranda of law were submitted by the parties. A hearing was held on Genie's appeal on 25 January 1995. Both Genie's counsel and counsel for the Comptroller were permitted oral argument. The following portion of the transcript was emphasized by the Comptroller:

---

6. The order also contained a tax deficiency stemming from Genie's on-site metered sales of $1,862.40 and interest owed through May, 1994 on both the off-site bulk sales and the metered sales of $37,134.33, bringing the total assessment against Genie to $150,919.98.

[COUNSEL FOR THE COMPTROLLER]: We have cited in our memorandum, your Honor, the analogous federal law because there is no State law that we could find or that [Genie's counsel] cited in his Memorandum interpreting a State tax fraud penalty in the civil context.

[THE COURT]: That surprised me.

Genie stresses the following statements by the trial judge in making his ruling:

Well, granted I have not read all the information contained in this box,[7] nor do I think that would be necessary.

I think in light of everything I've heard today, even though I may be saddened by the decision the Court's going to make, not so much from Mr. Calvert's standpoint, from [Genie's counsel's] standpoint, this Court does affirm the decision of the Tax Court for the reasons provided.

An order formalizing the above decision was signed by the trial judge on 1 February 1995 and docketed on 7 February 1995. This timely appeal followed. Additional facts will be added as necessary in our analysis.

## ANALYSIS
### SCOPE OF REVIEW

Final orders of the Maryland Tax Court are subject to judicial review as provided for contested cases under the Administrative Procedure Act ("APA"). TG § 13–532(a). Pursuant to the judicial review portion of the APA, whether the reviewing court is a circuit court or an appellate court, *Kohli v. LOOC, Inc.,* 103 Md.App. 694, 708, 654 A.2d 922 (1995) (citing *Fort Washington Care Ctr. v. Department of Health and Mental Hygiene,* 80 Md.App. 205, 213, 560 A.2d 613 (1989)), it may:

(1) remand the case for further proceedings;

(2) affirm the final decision; or

---

7. The circuit court's reference to "this box" presumably is to the cardboard container holding the record of the proceedings before the tax court.

(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion or decision:

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the final decision maker;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

(vi) is arbitrary or capricious.

Md.State Gov't Code Ann. ("SG") § 10–222(h) (Supp.1995).[8]

■ It is a settled principle that judicial review of a decision by the Maryland Tax Court is severely limited. *E.g., Rossville Vending v. Comptroller,* 97 Md.App. 305, 311, 629 A.2d 1283, *cert. denied,* 333 Md. 201, 634 A.2d 62 (1993) (citing *CBS, Inc. v. Comptroller,* 319 Md. 687, 697–98, 575 A.2d 324 (1990); *Comptroller v. Diebold,* 279 Md. 401, 407, 369 A.2d 77 (1977)). A distinction is drawn in the scope of review depending upon whether the tax court's order was based upon its factual conclusions or its application of law to those conclusions, as opposed to purely legal interpretations. A reviewing court will reverse the tax court if it erroneously determines or applies the law, employing a substituted judgment standard. *State Dept. of Assessments and Taxation v. Consumer Programs, Inc.,* 331 Md. 68, 72, 626 A.2d 360 (1993); *Rossville Vending, supra,* 97 Md.App. at 311–312, 629 A.2d 1283. In contrast, a reviewing court is required to affirm the tax court's

---

**8.** As mentioned, *supra,* the petition for judicial review was filed in the instant case on 12 August 1994. By § 1, ch. 59, of the Acts of 1993, effective 1 June 1993, the Legislature renumbered SG §§ 10–215 and 10–216 as §§ 10–222 and 10–223. It was not until 7 March 1995 that the language of TG § 13–532(a)(1) was changed to reflect the renumbering of the APA. Accordingly, TG § 13–532(a)(1) would have directed the petition to be filed in accordance with SG §§ 10–215 and 10–216 at the time the petition for judicial review was filed in the instant case. For our purposes, former SG § 10–215(g) and current SG § 10–222(h), transcribed *supra,* are identical.

factual determinations and its application of correct legal principles to those facts if they are supported by substantial evidence appearing in the record as a whole. *Supervisor of Assessments of Montgomery County v. Asbury Methodist Home, Inc.,* 313 Md. 614, 627, 547 A.2d 190 (1988) (citations omitted); *see Consumer Programs, Inc., supra,* 331 Md. at 72, 626 A.2d 360 (:iting *CBS, supra* ); *Ramsay, Scarlett & Co. v. Comptroller,* 302 Md. 825, 834, 490 A.2d 1296 (1985).

In this case, appellant argues that "the evidence [before the tax court did] not support the 50% penalty imposed . . . for an alleged violation of [TG § 13–703]." We find that the portion of the tax court's order that found a "violation" of TG § 13–703 and assessed what it believed to be a commensurate penalty was based upon its interpretation and application of the statute to the factual conclusion that false returns had been filed with fraudulent intent. Therefore, assuming that we find no error of law, we shall proceed to review the tax court's order, searching only for substantial evidence to support its conclusion that appellant fraudulently filed false tax returns, and thereby, the penalty provision of TG § 13–703 was properly invoked.

## I.

### BURDEN OF PROOF

■ Although the parties are both in agreement that it was the Comptroller's burden in the Maryland Tax Court to prove Genie's fraud by clear and convincing evidence, and neither party disputes that such a standard was in fact understood and employed by the tax court,[9] the parties cite to no Mary-

---

9. We note that while appellant does contest whether the evidence was sufficient to surmount the clear and convincing evidentiary hurdle, it does not assert directly, and therefore it is not an issue on this appeal, that the tax court applied the wrong standard, i.e., proof by a preponderance of the evidence. The record before the tax court does not specifically indicate which standard of proof the court was using in reaching its factual conclusions. There was, however, a Maryland Tax Court decision, cited in appellant's brief, recognizing that the clear and

land appellate decisions, nor has our research disclosed any, that hold such a standard would be applicable in proceedings relating to a civil tax penalty for fraudulent filing of false returns. Accordingly, before addressing the tax court's analysis underlying its imposition of the penalty, some discussion is warranted on the appropriate burden of proof to be applied in such proceedings.

■ It has been held in Maryland that the clear and convincing standard applies in cases of fraud or deceit generally, and in administrative proceedings particularly. *See, e.g., Everett v. Baltimore Gas & Elect. Co.,* 307 Md. 286, 300–04, 513 A.2d 882 (1986). The policy underlying the imposition of the "more exacting standard" of review in cases of fraud is "because of the seriousness of the allegations." *Id.* at 301, 513 A.2d 882. Generally, proof of a cause of action for civil fraud in Maryland requires: (1) that the defendant made a false representation to the plaintiff; (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth; (3) that the misrepresentation was made for the purpose of defrauding the plaintiff; (4) that the plaintiff relied on the misrepresentation and had the right to rely on it; and, (5) that the plaintiff suffered compensable injury resulting from the misrepresentation. *E.g., Nails v. S & R, Inc.,* 334 Md. 398, 415, 639 A.2d 660 (1994) (and cases there cited). In that same vein, to fall within the sphere of TG § 13–703, the taxpayer must file a false tax return with the intent to evade paying the State what, by law, it is owed. Substituting the State in place of "plaintiff" in the requisite elements, we see little difference in principle, relative to the gravity of the wrongdoing, between cases of tax fraud and fraud or deceit generally.[10] According-

---

convincing standard applied in interpreting the penalty provision contained in former Md.Ann.Code art. 81, § 345(b). *See Saks & Co., t/a Saks Fifth Avenue v. Comptroller,* Sales Tax No. 368 (1989).

**10.** We also note that, in addition to the general populace, Genie's competitors would also be harmed by its illegal tax-free sales. A diesel fuel seller who is unlawfully selling diesel fuel without collecting and

ly, we hold that, when assessing a penalty under TG § 13–703, the Comptroller bears the burden of proving, by clear and convincing evidence, that the taxpayer filed a false return with the intent to evade the payment of taxes.[11] Our task in reviewing the decision of the tax court in this case, therefore, is to determine whether there was substantial evidence contained in the record as a whole to support the tax court's finding, by clear and convincing evidence, that TG § 13–703 was applicable.

## CLEAR AND CONVINCING EVIDENCE?

Far more difficult than declaring the applicability of the clear and convincing standard of proof in tax fraud penalty cases is the task of providing a practical, workable definition of the standard for use by those hearing the cases. Nevertheless, the appellate courts of this State have adopted and formulated various definitions and guideposts to be used. In its most recent decision explaining the standard, the Court of Appeals stated:

> This "heightened standard" requires "a degree of belief greater than the usually imposed burden of proof by a fair preponderance of the evidence, but less than the burden of proof beyond a reasonable doubt imposed in criminal cases." That level of proof has been characterized as "strong, positive and free from doubt." We have also said that, to be

---

remitting the special fuel tax would be able to sell fuel at a reduced price or reap more profits from selling at the same price as its competitors who are properly remitting the tax.

11. We note that our holding in this regard is in concordance with a bevy of federal appellate decisions interpreting an analogous federal tax penalty provision, set forth, *infra*. *Heyen v. United States*, 945 F.2d 359, 364 (10th Cir.1991) (citing *Zell v. Commissioner*, 763 F.2d 1139, 1142 (10th Cir.1985)); *Douge v. Commissioner*, 899 F.2d 164, 168 (2d Cir. 1990) (and cases there cited); *Henson v. Commissioner*, 887 F.2d 1520, 1525 (11th Cir.1989); *Scallen v. Commissioner*, 877 F.2d 1364, 1369 (8th Cir.1989) (citations omitted); *Edelson v. Commissioner*, 829 F.2d 828, 832 (9th Cir.1987); *Estate of Gryder v. Commissioner*, 705 F.2d 336, 338 (8th Cir.), *cert. denied*, 464 U.S. 1008, 104 S.Ct. 525, 78 L.Ed.2d 709 (1983).

clear and convincing, "the proof must be 'clear and satisfactory' and be of such character as to appeal strongly to the conscience of the court."

*1986 Mercedes v. State,* 334 Md. 264, 283, 638 A.2d 1164 (1994) (quoting *Owens–Illinois v. Zenobia,* 325 Md. 420, 469, 601 A.2d 633 (1992); *Berkey v. Delia,* 287 Md. 302, 318, 413 A.2d 170 (1980) (in turn quoting *Stone v. Essex County Newspapers, Inc.,* 367 Mass. 849, 330 N.E.2d 161, 175 (1975)); *First Nat'l Bk. v. U.S.F. & G.,* 275 Md. 400, 411, 340 A.2d 275 (1975)). At least two Court of Appeals and two Court of Special Appeals decisions have recently cited with approval the definition suggested by the Committee on Civil Pattern Jury Instructions of the Maryland State Bar Association contained in MJPI 1:8(b):

To be clear and convincing, evidence should be "clear" in the sense that it is certain, plain to the understanding, and unambiguous and "convincing" in the sense that it is so reasonable and persuasive as to cause you to believe it.

*Wills v. State,* 329 Md. 370, 374 n. 1, 620 A.2d 295 (1993); *Vogel v. State,* 315 Md. 458, 470–71, 554 A.2d 1231 (1989); *Meyers v. Montgomery County Police Dept.,* 96 Md.App. 668, 688, 626 A.2d 1010 (1993); *Weisman v. Connors,* 76 Md.App. 488, 505, 547 A.2d 636 (1988), *cert. denied,* 314 Md. 497, 551 A.2d 868 (1989).

We shall employ the above definitions of clear and convincing evidence in analyzing the evidence before the tax court in the instant case.

## PROVING FRAUD

It has long been recognized that the elements of tax fraud, like general civil fraud (and its brethren, i.e., malice, deceit, and wrongful motive), are seldom confessed by the accused party. Direct evidence that fraud was committed is not necessary; rather, it is more often inferred by circumstantial evidence. *McClung–Logan Equipment Co. v. Thomas,* 226 Md. 136, 148, 172 A.2d 494 (1961). In the context of tax fraud, federal cases interpreting an analogous Internal Reve-

nue Code penalty provision [12] have developed certain "badges of fraud" as an aid in making the determination whether fraud occurred.[13] The badges, indicia, or factors to look for in the tax fraud context include:

(1) consistent and substantial understatements of income (or sales, in the sales tax arena);

(2) failure to maintain adequate records;

(3) implausible or inconsistent explanations of behavior, including the lack of credible testimony before a tribunal;

(4) concealment of assets;

(5) failure to cooperate fully with tax authorities;

(6) awareness of the obligations to file returns, report income or sales, and pay taxes; and

(7) failure to file returns.

*See Alexander Shokai, Inc. v. Commissioner,* 34 F.3d 1480, 1487 (9th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 1690, 131 L.Ed.2d 555 (1994) (citing *Bradford v. Commissioner,* 796 F.2d 303, 307 (9th Cir.1986)); *Day v. Commissioner,* 975 F.2d

---

**12.** The Internal Revenue Code section states, in pertinent part:

If any part of any underpayment . . . of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud.

26 U.S.C.A. § 6653(b)(1) (subsequently recodified as 26 U.S.C.A. § 6663).

**13.** We note that TG § 10–107 states that "[t]o the extent practicable, the Comptroller shall apply the administrative and judicial interpretations of the federal income tax law to the administration of the income tax laws of this State." In addition to the fact that the taxes at issue in this case are not technically "income" taxes, it has been held that TG 10–107 only "applies where the Maryland Tax Code is 'inextricably keyed' to the federal tax code 'by virtue of its adoption of the federal tax law.'" *Lyon v. Campbell,* 324 Md. 178, 185, 596 A.2d 1012 (1991) (quoting *Comptroller v. Chesapeake Corp.,* 54 Md.App. 208, 213–14, 458 A.2d 459, *cert. denied,* 296 Md. 653 (1983)). Thus, application of the federal case law in this case is not mandatory. Nevertheless, interpretations of analogous Internal Revenue Code provisions can offer guidance to Maryland courts in interpreting the Maryland Tax Code. *Id.* (citing *Dun & Bradstreet Corp. v. Comptroller,* 86 Md.App. 258, 265–67, 586 A.2d 752 (1991)).

534, 538–39 (8th Cir.1992); *Douge v. Commissioner, supra* (citing *Bradford v. Commissioner, supra* ); *Laurins v. Commissioner,* 889 F.2d 910, 913 (9th Cir.1989); *Scallen v. Commissioner, supra,* 877 F.2d at 1370; *Korecky v. Commissioner,* 781 F.2d 1566, 1568 (11th Cir.1986) *(per curiam* ).

 We are persuaded that the aforementioned badges of fraud will be helpful to Maryland tribunals in performing the analysis whether § TG 13–703 should be invoked, and we hereby incorporate their use into the body of caselaw interpreting the statute. In so doing, we wish to make clear that no one badge or factor should be given excessive weight. Specifically, we do not believe that understatement of income, in and of itself, would be enough to prove fraud. *See Merritt v. Commissioner,* 301 F.2d 484, 486 (5th Cir.1962). In addition, it would not be required that a specified number of badges be present to invoke the statute. Certainly, the more badges demonstrated in any given case would increase the likelihood that clear and convincing evidence of fraud has been shown; nevertheless, proof of tax fraud still must be determined by the specific facts and circumstances in each case.

## DETERMINATION OF FRAUD
## IN THE INSTANT CASE

 We agree with the Comptroller that Genie has accumulated several of the aforementioned badges of fraud in this case. By Mr. Calvert's own admission before the tax court, Genie underreported its off-site bulk sales of diesel fuel in its reports or returns to the Comptroller. The underreporting (or lack of even filing returns, a distinct badge of fraud itself) took place over a long period of time. *See* Facts, Part C., *supra.* Similarly, the amount of understatement was nearly the amount of reported sales volume, which is certainly substantial. *Id.* In addition, the records Genie kept to support its claim that certain sales were tax exempt were inadequate, according to the Comptroller's standards. Furthermore, we can understand why both the Comptroller and the tax court found unbelievable, for the most part, Mr. Calvert's explana-

tions for why he thought the five large commercial customers at issue were tax exempt entities.

Of course, it is not necessary that we be convinced that the above indicia of fraud were displayed. All that is required is that we find substantial evidence in the record before the tax court to support its factual conclusion, by clear and convincing evidence, that fraud occurred. Employing the above-described definitions or descriptions of the clear and convincing standard of proof, we find that substantial evidence supports finding at least four of the badges of fraud, and therefore the factual conclusion that Genie filed false returns with the intent to evade paying sales taxes reasonably derives. In essence, the tax court found the precise factual predicate necessary to invoke TG § 13–703, and we perceive no error in the tax court's statutory interpretation. The factual predicate having been established, we hold, accordingly, that substantial evidence also supported the application of TG § 13–703 to the facts of the instant case to impose a 50% penalty on the taxes owed by Genie.[14] Therefore, employing our limited role of judicial review of tax court decisions, we conclude that the decision of the tax court should be affirmed.

## II.

Appellant also contends that we must remand the case to the circuit court because it was denied its right of judicial review by the court's "summary affirmance" of the tax court's decision. Specifically, appellant asserts that the circuit court did not "even consider the extensive administrative record" when rendering its decision, alleging as proof the following comment by the court: "Well, granted I have not read all of the information contained in this box, nor do I think that would be necessary." Similarly, appellant alleges that the 25 January 1995 hearing was "far too brief considering the

---

14. We make no finding as to what the specific maximum acceptable percentage penalty would be under the facts of this case. We conclude only that substantial evidence supported the application of the statute to impose a 50% penalty.

extensiveness of the administrative record, the issues involved, and the more than $150,000 of tax, interest, and penalties at stake." Appellant argues that this conduct by the trial judge failed to follow "standard procedures," or, "[a]t the very least," was "an abuse of discretion." We deem these arguments to be without merit.

Primarily, we do not share appellant's view that the explicit comments made on the record by the circuit court necessarily lead one inescapably to the conclusion that the tax court record was not examined. As the cases cited in the Standard of Review section, *supra,* indicate, the reviewing court is to search for substantial evidence contained in the record as a whole to support the tax court's factual conclusions and its application of law to facts. Nevertheless, saying that the trial judge did not read *all* of the information is not equivalent to saying that he did not read *any* of it. In addition, the portion of the transcript emphasized by the Comptroller, that the trial judge was "surprised" by the lack of Maryland appellate guidance on the civil fraud penalty, supports the inference that the court was familiar with the issues of the case. Similarly, in this particular case, we think it quite possible for meaningful judicial review to be afforded without the reviewing court examining every intricate detail of the supporting financial documentation provided by either Genie or the Comptroller.

Moreover, our examination of the record indicates that the administrative record was duly transmitted to the circuit court, both parties submitted memoranda of law, and the transcript of the hearing reveals that counsel for both parties were given all the time that they requested for oral argument. This is all that the Maryland Rules require. *See* Md.Rules 7–201(b) (applicability to tax court), 7–206 (record transmittal), 7–207 (memoranda), 7–208 (hearing). We see no failure to follow, or an attempt to truncate, the appropriate procedures for judicial review of a tax court decision by the circuit court in this case.

Even on the assumption, *arguendo,* that the trial court did not fully perform its obligations of judicial review, judicial

review under the APA is essentially identical on appeal to this Court as it was before the circuit court. *E.g., Kohli, supra,* 103 Md.App. at 708, 654 A.2d 922. Any deficiency in the circuit court's review would be remedied by the complete review afforded appellant in this Court and, therefore, would not be prejudicial error.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**